855 F.2d 1106
 PAN EASTERN EXPLORATION CO. and Anadarko Petroleum Corp.,
Plaintiffs-Appellants Cross-Appellees,
v.
HUFO OILS, et al., Defendants-Appellees,
and
Billy Mack Gideon, Canadian Commercial Bank and First
National Bank in Albuquerque, Defendants-Appellees
Cross-Appellants.
PAN EASTERN EXPLORATION CO. and Anadarko Petroleum Corp.,
Plaintiffs-Appellants Cross-Appellees,
v.
MITCHELL ENERGY & DEVELOPMENT CORP., et al., Defendants-Appellees,
and
Billy Mack Gideon, Canadian Commerce Bank and First National
Bank in Albuquerque, Defendants-Appellees Cross-Appellants.
 No. 87-1033.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 27, 1988.
Rehearing Denied Nov. 2, 1988.
 
 Butler & Binion, James V. Hammett, Jr., Deborah Essig Taylor, Houston, Tex., for appellee Mitchell Energy, et al.
 Eugene B. Labay, San Antonio, Tex., for Pan Eastern Exploration Co. and Anadrako Petroleum Corp.
 Reynolds, Allen & Cook, Andrew M. Taylor, Ivan D. Hafley, Austin, Tex., for appellee Billy Mack Gideon.
 Bracewell & Patterson, Joe H. Foy, Mary Katherine Kennedy, Sarah B. Pierce, Houston, Tex., for appellees--Houston Natural Gas Corp., et al.
 Cotton, Bledsoe, Tighe & Dawson, Charles L. Tighe, Susan R. Richardson, Midland, Tex., for appellees--First Nat'l Bank in Albuquerque.
 James L. Stone, Stephen W. Seifert, Denver, Colo., for appellee Canadian Commercial Bank.
 Tim Gideon, Austin, Tex., for appellee Hufo Oils, et al.
 Dan Lain, Hurst, Tex., Glover Roberts, Dallas, Tex., for appellees J. Michael Curran, Trustee for the Bankruptcy Estate of Ted True, Inc., and Dean Gandy, Trustee for the Bankruptcy Estate of Ted True.
 Marshall S. McCrea, Jr., Midland, Tex., for appellee Aplex Oil & Gas, Inc., et al.
 Jerry D. Courtney, Clarendon, Tex., for appellee Robert Brent, et al.
 Carrington, Coleman, Sloman & Blumenthal, Marvin S. Sloman, William B. Dawson, Rebecca P. Adams, Dallas, Tex., for appellee Canadian Commercial Bank.
 Appeals from the United States District Court for the Western District of Texas.
 Before CLARK, Chief Judge, and GEE and RUBIN, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 Plaintiffs Anadarko Petroleum Corporation ("Anadarko") and its wholly-owned subsidiary Pan Eastern Exploration Company ("PEEC") own the natural gas rights in certain sections of land in the Panhandle Field of Texas. Certain of the defendants own the oil and casinghead gas rights in the same sections. The plaintiffs sued, claiming that some defendants wrongfully produced their gas, and that other defendants purchased, processed, and transported the converted gas. The defendants argued that they did not take the plaintiffs' gas; also, they asserted that even if they did the taking was with the consent of the plaintiffs or their affiliate corporation Panhandle Eastern Pipe Line Company ("PEPL" or "the pipeline") whose acts were binding on the plaintiffs. Some defendants made counterclaims against the plaintiffs and claims against PEPL. The jury rejected all claims by all parties. Plaintiffs and certain defendants appeal from various orders and from judgment entered on the jury verdict. We affirm in large part and remand in part for further proceedings.
 
 A. The Facts[1]
 
 2
 Beneath the surface of the Texas Panhandle is a vast hydrocarbon reservoir that since 1917 has produced huge quantities of oil and gas. The parties vigorously dispute the precise geological structure of this reservoir, but roughly speaking the upper formations--the so-called Red Cave, Brown Dolomite, and Moore County Lime formations--tend to be more productive of gas while the lower formations--the Granite Wash being the only one relevant here--tend to be more productive of oil.
 
 
 3
 Throughout much of this region the right to produce gas from beneath a given tract has been severed from the right to produce oil and casinghead gas, so that one party may own the gas rights and another party the oil and casinghead gas rights throughout all horizontal formations beneath the very same piece of land. The division of gas rights from oil rights in the Panhandle Field of Texas apparently occurred many years ago, but only recently--under new market incentives to produce valuable "undedicated" natural gas[2]--the oil and casinghead gas owners and their lawyers discovered that the division of rights is a rich deposit of legal ambiguities waiting to be mined. With the advent of new drilling and legal strategies, the so-called "split leases" have now for several years produced a steady flow of gas, controversy, and litigation.[3] This massive case may be one of the last surges in production, reaching our Court as Texas administrators and courts have started to limit the flow.[4]
 
 1. The Parties
 
 4
 PEPL held gas leases and owned the gas wells on the disputed sections for many years. Anadarko was its wholly-owned subsidiary, formed to hold and develop various properties including some of the leases at issue in this case. In the early 1970s, PEPL assigned the ownership of the wells to PEEC, a newly-formed subsidiary of Anadarko. This assignment, undertaken with the permission of the Federal Power Commission, allowed PEEC to charge more for the gas under federal regulations than could its super-parent PEPL. In the early 1980s, PEPL spun back a new corporate parent called Panhandle Eastern Corporation, turning itself into an affiliate rather than the parent of the plaintiffs. The scorecard then looked like this: Panhandle Eastern Corporation--the new corporate parent--owned all the stock of PEPL and of plaintiff Anadarko; Anadarko in turn owned all the stock of plaintiff PEEC. At all times relevant to this dispute PEPL was an affiliate of the plaintiffs.
 
 
 5
 Plaintiff Anadarko was a fully-functioning exploration and production subsidiary of Panhandle Eastern Corporation with hundreds of employees and various corporate activities. Plaintiff PEEC, on the other hand, was what a non-lawyer would call a "shell" corporation. It owned several former PEPL wells but had only one full-time employee. Anadarko took care of the day-to-day management of PEEC's affairs, while PEPL continued to operate PEEC's gas wells (formerly PEPL's wells) under a contract denominating it an "independent contractor" of PEEC. PEPL's responsibilities for PEEC's wells included administrative, legal, field, and office work, including regulatory, purchasing, insurance, taxation, negotiation, and accounting services on behalf of PEEC. As is typical of such a corporate "family," Panhandle Eastern Corporation (the parent), Anadarko and PEEC (the plaintiffs), and PEPL (the affiliate) had interlocking but not identical officers and directors. The profits and losses of all members of the Panhandle Eastern family were aggregated for purposes of financial statements and periodic disclosures to the Securities Exchange Commission (Panhandle Eastern Corporation was a publicly held corporation). At all times, however, all corporate formalities were strictly observed and there is not a hint in the record of any legal irregularities in the way the various affiliates operated.
 
 
 6
 The plaintiffs sued a number of defendants for conversion and other wrongs. The parties have divided the defendants into functional groups. The "operator defendants" are the persons and entities that drilled and produced the oil wells or that owned a working interest in the wells; this group includes the two main operators Hufo Oils and Ted True, Incorporated and their owners. The "processing defendants" are Mitchell Energy & Development Corporation and its subsidiary Liquid Energy Corporation; these defendants installed a small gas plant on the property that processed the gas produced by the operator defendants before it was sold to the pipeline defendants. The "pipeline defendants" are Houston Natural Gas and its subsidiaries Houston Pipe Line Company and Intratex Gas Company; along with PEPL, the operator defendants' first customer, these pipeline companies purchased gas from the operator and processing defendants. Finally, the "bank defendants" are Canadian Commercial Bank and First National Bank in Albuquerque; they loaned money to Ted True, Inc. to drill and complete many of the wells at issue in this case.
 
 
 7
 2. Producing Casinghead Gas for Fun and Profit
 
 
 8
 (a) The Beginnings of the Dispute
 
 
 9
 In 1981, Hufo Oils, a partnership of defendants Lynn Hunt and Carl Foulds, obtained an oil and casinghead gas lease covering certain sections of land in which the plaintiffs held the gas rights. Hufo Oils assigned working interests to a number of investors. The investors elected Hufo Production Corporation, also owned by Hunt and Foulds, to be the operator of the leases. Hufo's leases were initially limited by horizon to the Red Cave and the Granite Wash formations, the most shallow and deepest[5] formations in the Panhandle Field. After drilling the first well, Foulds thought that the formations between the Red Cave and Granite Wash--including the Brown Dolomite and Moore County Lime--looked promising for oil and casinghead gas production. Hufo later obtained new leases from the landowners, giving it the oil and casinghead gas rights throughout all these formations.
 
 
 10
 Meanwhile, Hunt approached PEPL gas purchase agent John Gurche to see if the pipeline would be interested in purchasing the casinghead gas that Hufo planned to produce. Apparently, Hunt sought out PEPL because it was already purchasing gas from Hufo at other locations in the Panhandle Field. The pipeline was eagerly looking for new supplies of gas because at that time there was a tremendous unmet demand for gas. At first, Gurche and pipeline engineers studied Hufo's proposal and rejected it because the initial projected volumes from the Red Cave and Granite Wash were too small to justify the necessary expenses in hooking up the wells to the pipeline. In late 1981, Hunt once again approached Gurche with an offer to sell casinghead gas to the pipeline. This time, the pipeline's engineers projected total gas production more than 20 times greater than that of the original proposal; a satisfied Gurche then sent Hufo a proposed long-term casinghead gas contract.
 
 
 11
 Before the contract was executed, however, Gurche's supervisor Richard Dixon ordered that the pipeline cease all casinghead gas purchases until further notice. Dixon was the senior vice president of gas supply at PEPL; he was also the Chief Executive Officer of plaintiff PEEC and a member of plaintiff Anadarko's board of directors. Dixon wanted to review the growing controversy in the Panhandle Field over "white oil" operators (such as Hufo) before proceeding with gas purchases from them.
 
 
 12
 (b) The "White Oil" Controversy
 
 
 13
 No geological formation contains either natural gas or crude oil alone; there are always some liquid hydrocarbons in a formation of gaseous hydrocarbons, and vice versa. In consequence, all oil wells produce at least trace amounts of gas and gas wells produce at least trace amounts of oil. Frequently, legitimate oil wells produce a great deal of gas, and gas wells a measurable amount of oil. There is no inherent or metaphysical distinction between oil wells and gas wells; it just depends on what comes up. Therefore, the State of Texas sensibly classifies oil wells and gas wells based on the ratio between the amount of oil produced and the amount of gas produced: if the gas-to-oil ratio ("GOR") is greater than 100,000 cubic feet of gas per barrel of oil, the well is a gas well; if the GOR is less than or equal to 100,000 cubic feet of gas per barrel of oil, the well is an oil well. See Tex.Nat.Res.Code Sec. 86.002(5)-(6) (1978).
 
 
 14
 For several years before Hufo began drilling the wells in this case, operators had been buying up oil and casinghead gas rights in the Panhandle Field, then drilling putative oil wells and producing some oil along with large quantities of gas. At that time, the market for natural gas was booming, and the value of new "undedicated" gas was high.[6] The primary economic value of these oil wells was in the casinghead gas.
 
 
 15
 These new "casinghead gas wells" were controversial for several reasons. First, there was a general feeling (among the gas producers, anyway) that it was wrong for "white oil" operators to produce casinghead gas from the Brown Dolomite and Moore County Lime formations because, although there had long been oil production from these formations in a few locations around the Panhandle Field, the Brown Dolomite and Moore County Lime had historically been viewed as "dry gas" formations.
 
 
 16
 Second, and more to the point, there were two completion and production practices associated with the "white oilers" that were of dubious legality. The first gave them their name: many such operators asserted that they could count the volatile hydrocarbon liquids called "white oil" created at the surface from casinghead gas with "low temperature extraction" or LTX units as "oil" for purposes of computing their GOR and classifying their wells as oil wells. See generally Colorado Interstate Co. v. Hufo Oils, 802 F.2d 133 (5th Cir.1986). Since a good deal of the volume of the gas can be converted to liquids, if this practice was legal a well that would otherwise be a statutory gas well could be converted into a statutory oil well by installing an LTX unit at the surface.[7] The second dubious practice--typically referred to as the "high perforations" issue--was that the oil operators would drill their wells down to the deeper oil-producing strata, but would perforate (shoot holes in the casing and the rock) at higher levels (usually in the Brown Dolomite and Moore County Lime) where gas wells had been producing for years with little show of oil. These "high perf" wells frequently would qualify as statutory oil wells even without the use of LTX units. The cautious[8] oil operators asserted that they were producing both oil and gas through the high perforations; they did so in order to meet the definition of casinghead gas as "gas or vapor indigenous to an oil stratum and produced from the stratum with oil." Tex.Nat.Res.Code Sec. 86.002(10) (1978). But the gas owners were suspicious that the oil produced by these wells was coming predominantly--if not totally--from the low perforations in the oil zones while the gas was coming from the high perforations in "their" gas zones.
 
 
 17
 This case more concerns the second of these problems than the first: The operator defendants used an LTX unit on a few of their oil wells, but neither used the LTX liquids to qualify the wells as statutory oil wells nor asserted a right to do so. The central issue in the case, as will soon appear, was whether the defendants wrongfully produced the plaintiffs' gas through high perforations in the Brown Dolomite and the Moore County Lime.
 
 
 18
 (c) The Hufo Contract
 
 
 19
 So Richard Dixon, vice president of gas supply for PEPL and CEO of plaintiff PEEC, decided to slow down, stand back and take stock of the situation. The pipeline was buying large quantities of putative casinghead gas from oil operators in the Panhandle Field, and it was planning on buying more. But the "white oil" practices were already being challenged in a widely-publicized administrative proceeding before the Railroad Commission,[9] and there were rumblings on the "high perforations" issue as well.[10] In consequence, all purchases of casinghead gas ceased in February 1982 while PEPL officials tried to assess the risks involved in purchasing gas from "white oil" operators such as Hufo.
 
 
 20
 Dixon and other PEPL officials met in early February to discuss the problems surrounding the purchase of casinghead gas. After the meeting, Dixon and the others decided to proceed with the Hufo contract. This decision and the circumstance surrounding it are the key to the defendants' affirmative defenses. We will discuss it in detail below in section A.3.
 
 
 21
 The contract between PEPL and Hufo called for a steady increase in Hufo's casinghead gas production, with a commensurate, three-phase obligation on the part of PEPL to improve and expand its gathering facilities and to take or pay for larger and larger quantities of gas. The first phase involved minor improvements to pipeline's facilities and purchases of up to 6,500 mcf[11] per day. The second phase, beginning July 1982, was to involve a $350,000 expansion of facilities and the take or pay purchase of 10,000 mcf per day. And the third phase, beginning August 1983 and requiring FERC approval, was projected to cost PEPL in the range of $5 million to $9 million and to require the purchase of up to 60,000 mcf per day depending on supply. PEPL officials, well aware by this time that Hufo's wells might drain the plaintiffs' gas reserves,[12] inserted a specially-crafted definition of casinghead gas designed to protect from and indemnify against claims based on the illegality of Hufo's production practices.[13] The parties signed the 15-year contract in mid-February 1982, and PEPL began purchasing gas from Hufo's wells a few days later.
 
 
 22
 Hufo drilled and completed several wells on the disputed sections. These wells passed the initial Railroad Commission GOR tests and were classified as oil wells. Thereafter, Hufo installed and operated a central LTX unit that removed liquids from the gas coming from all the wells. Hufo then mixed the extracted liquids with the crude oil and reported the total liquid amounts as the oil production on monthly Commission reports. This practice arguably was required by contemporaneous Commission rules and opinion letters. For reasons that are not clear from the record, Hufo's performance did not satisfy the working interest owners, and they replaced operator Hufo with Ted True, Incorporated in November 1982. Mr. Ted True, not surprisingly the owner of Ted True, Inc., soon acquired all Hufo's interest in the operations.
 
 
 23
 (d) True's Progress
 
 
 24
 True began an ambitious drilling program. He drilled 76 wells, 21 of which became a part of this dispute. Once again, the True wells were initially tested and passed GOR requirements without an LTX unit. While True continued to gather and to report as oil the LTX liquids from the five original Hufo wells, he did not install any LTX units on the 21 new wells.
 
 
 25
 Defendant Billy Mack Gideon was an employee of True in charge of drilling, completing, and perforating the wells. True gave him the authority to choose where to drill and where to perforate. Gideon did not have any ownership interest in the wells.
 
 
 26
 Meanwhile, as True geared up for greater and greater gas production in late 1982 and early 1983, PEPL was facing a sudden turn-around in the gas market. The low supply and high demand of early 1982 disappeared, as demand slacked while new gas inventories--developed during the gas shortage--began to come on-line. Dixon ordered his buyers to stop new purchases and, in early 1983, PEPL sent telegrams to all producers telling them to defer new drilling and workovers that would increase their production. In its annual report, Panhandle Eastern Corporation (the parent corporation of PEPL and the plaintiffs) stated that the oversupply problem had become so serious that it "created uncertainties concerning the continued viability of the pipeline company."
 
 
 27
 Gurche met with True in early 1983 to find out about True's development plans; True reported that he planned to develop the properties at the rapid pace called for in the contract. PEPL was in a bind: under the original Hufo contract, to which True had succeeded, it was obligated to complete a multi-million dollar improvement of its gathering facilities by late summer 1983 and to purchase up to 60,000 mcf of gas. If it failed to make the necessary improvements, it still had to pay True for the gas he made available. In consequence, PEPL set out to persuade True either to limit his production or to find another buyer.
 
 
 28
 PEPL's legal department considered various strategies for discouraging True from increasing production. It seized on Hufo's failure to meet a June 1982 contractual deadline for development plans until November 1982, sending a letter to Hufo stating that it would not meet its third-phase obligations in August 1983 because of Hufo's failure. Although the pipeline knew that True had replaced Hufo and in fact had discussed these matters with True, the letter went to Hufo because True had never formally succeeded to Hufo's contract with the pipeline; and legal formality was part of the pipeline's new strategy. Pipeline officials eventually decided in May or June 1983 to try to terminate the Hufo/True contract.
 
 
 29
 In the meantime True, needing funds to finance his drilling operations, proposed to borrow money from the bank defendants. After reviewing independent engineering reports on True's potential for gas production and visiting the drilling sites, defendant Canadian Commercial Bank ("CCB") loaned True $15 million in June of 1983, funding half the loan then and the remainder during the next six months. Defendant First National Bank in Albuquerque, whose loan officer had originally explored the True deal and offered it to CCB, purchased a participation interest of $3 million in the True loan in August 1983.
 
 
 30
 At about this time PEPL informed True that it would not begin phase three of the gas purchase contract because of asserted breaches of the agreement by Hufo and True. True calculated that although he could win a breach-of-contract suit against the pipeline, he could not afford the delay and cost of legal remedies. His financial pressures shot up during this time as his production income dropped to zero: first, PEPL closed its pipeline for repairs for several weeks and asserted immunity from financial liability by reason of the force majeure contract provision; second, the pipeline suspended payments for a time under appropriate contract provisions because True was being sued by another gas producer who claimed that he was stealing its gas on adjacent leases. True decided to seek other buyers for his gas rather than sue PEPL, and eventually he agreed to terminate the PEPL contract at the end of 1983.
 
 
 31
 True entered into agreements with defendants Liquid Energy Corporation ("LEC") and Houston Pipe Line Company to purchase his casinghead gas. During the negotiations, Bruce Withers, president and chief operating officer of LEC and president of the Transmission and Processing Division of LEC's parent Mitchell, telephoned his friend Dan Kelley, then the vice president of gas supply for PEPL, to inform him of the negotiations between LEC and True and to check True's representation that PEPL did not want the gas and was willing to cancel the contract when True found another buyer. Kelley confirmed that PEPL would release the gas as True had stated. In response to Withers' question, Kelley stated that he had no objections to LEC's proposed contract with True. Withers testified that he "certainly relied" on Kelley's statements in proceeding with the True contract.
 
 
 32
 LEC built a gas processing facility on the leases at a cost of $12 million. It bought some compressors from PEPL that were used in the plant; PEPL knew that LEC was building a gas processing plant and that the compressors were to be used to separate liquids from True's casinghead gas. The plant began operation in December 1983, separating liquids in the casinghead gas from the gas stream. These liquids were mixed with the produced crude oil in storage tanks and, pursuant to advice from the Railroad Commission staff,[14] counted as oil on Commission reports. Houston Pipe Line purchased the gas residues from the tailgate of the LEC plant. Defendant Intratex, an affiliate of Houston Pipe Line, later took over performance of the True contract.
 
 
 33
 (e) True's Regress
 
 
 34
 True's casinghead gas business struggled along for a time but never got off the ground. By early 1984, he was unable to pay trade creditors as accounts became due; and he fell behind on his loan payments to the bank defendants. The bank defendants then tried to exercise their contractual right to receive directly LEC's purchase payments to True, but it is unclear from the record whether they actually received any money in this manner. In May 1984, True--both Mr. Ted True and Ted True, Inc., that is--went into bankruptcy, where they remained at the time of trial.
 
 
 35
 As his financial difficulties increased, True became unable to maintain the wells properly so as to keep them producing at their full capacity. Wells in the Panhandle Field require regular maintenance to prevent paraffin from clogging the perforations. Paraffin is a thick, waxy substance that accumulates in conjunction with the production of crude oil. Moreover, oil wells must be regularly maintained and repaired because of mechanical problems such as broken pumps, holes in tubing, and parted rods. Any of these problems can reduce or eliminate a well's oil production, but they tend to have a lesser effect on the well's production of gas. Consequently, an oil well's GOR tends to increase as maintenance declines; in other words, a poorly-maintained well can lose its statutory status as an oil well because it produces more than 100 mcf of gas per barrel of oil. Initially, True treated the wells for paraffin buildup about every other week, but his financial troubles caused him to cut back on the paraffin treatments to less than one a month, and finally to eliminate treating the wells altogether.
 
 
 36
 In October 1984, an independent testing company performed GOR tests on nine True oil wells, eight of which are among the 26 in dispute. The testing company counted only the crude oil that was produced and not any LTX liquids in calculating the wells' GORs. Despite the wells' deteriorating condition, all but one of them qualified as oil wells under the test, and, in the opinion of a witness from the testing company, the well that failed would probably have passed had it been properly maintained. After the Railroad Commission's decision in the Phillips proceeding, in the spring of 1985, eight wells connected to an LTX unit on the lease were tested; five wells failed the test and the remaining tests were inconclusive. Finally, after this suit commenced the district court directed that the wells be re-tested or shut in. True was long in bankruptcy and was no longer operator of the wells. The working interest owners formed their own operating company but had little success with the wells as they were in bad condition, clogged with paraffin, with parted rods and pump jacks down. The investors treated and tested some of the wells but none passed the GOR tests. All wells were then shut in by order of the district court pending the outcome of this suit. There was some gas production between the time the plaintiffs brought suit and the time the wells were shut in.
 
 
 37
 3. Confusion Above: The Plaintiffs' Ambivalence
 
 
 38
 The defendants presented compelling evidence that the plaintiffs' managers were aware that because of Hufo and True's drilling and production practices the operator defendants might be producing gas that belonged to the plaintiffs, but nonetheless decided to proceed with the PEPL casinghead gas purchase contract because of PEPL's overriding need for more gas. The defendants' circumstantial evidence was elaborate and far-ranging, and we will not attempt to summarize all of it here. Instead, we focus on the behavior of three protagonists: Richard Dixon, CEO and Chairman of the Board of plaintiff PEEC, a director of Anadarko, and senior vice president of PEPL in charge of gas supply; Robert Allison, CEO and director of plaintiff Anadarko, director of PEEC, PEPL, and Panhandle Eastern Corporation, and group vice president of Panhandle Eastern Corporation; and Richard O'Shields, Chairman of the Board of Panhandle Eastern Corporation (the overall parent), PEPL, Anadarko, and director of PEEC (later Chairman of the Board of PEEC).
 
 
 39
 Richard Dixon was in a tough situation. He was in charge of gas supply at PEPL and PEPL needed gas--lots of gas in a hurry. Dixon testified that he was "anxious" to find new sources of gas to meet the demands of his customers. Much of PEPL's new gas supply was casinghead gas produced by independent "white oil" operators such as Hufo. In early 1982, Dixon learned of the Phillips proceeding, in which certain traditional gas operators were asking the Railroad Commission to forbid the use of LTX units and to prohibit high perforations in the gas zones. Dixon realized that his casinghead gas sources might be jeopardized by a ruling adverse to the independents, and this concerned him. So while his gas purchase agent John Gurche was in the middle of negotiating a contract with Hufo, Dixon ordered a moratorium on new casinghead gas purchases while he became better informed on the issues.
 
 
 40
 Dixon, Gurche, and several other PEPL agents, lawyers, and engineers met in early February with a lawyer from Austin who was considered an expert on the Phillips proceeding and the "white oil" issues. Gurche memorialized the February meeting in a classic "smoking gun" memorandum to the file:
 
 Note to the File 2/8/82
 
 41
 Re: Hufo Oils--Potential Casinghead Gas Contract; Brent Lease Moore Co. Tx.
 
 
 42
 Due to many questions surrounding casinghead gas in Texas which have arisen as a result of the Phillips petition to the Texas Commission, Mr. Matheson arranged for Mr. David Nelson of Akin, Gump, Hauer and Feld, law firm of Austin, Texas to come to Kansas City and brief Mr. Dixon and our company attorneys on the split lease situation in Texas with respect to oil (casinghead gas) and dry gas. Mr. Nelson, who represents some of the independents, outlined the arguments on both sides of the issue in depth.
 
 
 43
 Later, as a result of the meeting it was decided that if Panhandle [PEPL] failed to follow through on its offer for the Hufo gas it would end up being marketed to someone else, and, if as Phillips contends, there is dry gas being co-mingled with the casinghead, then our dry wells under contract on that acreage [the plaintiffs' wells] would be drained and we would lose the dry gas entirely. It was decided, therefore, to proceed with the Hufo contract, but to modify the definition of casinghead gas to state that it has to be in conformity with Texas Commission rules regarding gas oil ratios.
 
 
 44
 Dixon was the senior PEPL official at that meeting, and presided over the decision to proceed; he was also the CEO of plaintiff PEEC.
 
 
 45
 Like Dixon, Robert Allison was in a tough situation. He became concerned in the early 1980s that the independent "white oil" operators were perforating the dry gas zones in the Brown Dolomite. As a director of PEPL, he was concerned that the pipeline was buying stolen gas; as CEO of Anadarko, and as effective manager of PEEC's wells under management contracts between PEEC and Anadarko, he was concerned that his gas was being stolen. Sometime in 1982, Allison began complaining. First, he called Richard Matheson, a PEPL vice president in charge of gas supply. Allison told Matheson that the pipeline should not buy casinghead gas from the "white oil" operators because they were stealing it from the legitimate gas owners. Matheson responded that PEPL did not intend to change its purchasing practices. Dissatisfied, Allison called Matheson's superior, Dixon. Allison told Dixon that the pipeline was buying gas from Hufo and that Hufo was probably stealing the gas from Anadarko and Dixon's own company PEEC; he suggested that the pipeline stop buying casinghead gas from the independents. Allison testified about Dixon's response as follows:
 
 
 46
 Q. And Mr. Dixon responded to you that the pipeline was going to continue doing this [buying casinghead gas from independents], didn't he?
 
 
 47
 A. Yes.
 
 
 48
 Q. And he told you that if the pipeline didn't buy the gas someone else would; isn't that right?
 
 
 49
 A. That was certainly his comment, well, you know, if Panhandle Eastern Pipe Line doesn't buy it, some other pipeline would. So our rights, Anadarko's rights would be hurt in either case.
 
 
 50
 Understandably, Allison was still not satisfied. He turned to the top man in the Panhandle family of corporations, Richard O'Shields. Allison told O'Shields what that he believed that the pipeline was buying gas that was being converted from Anadarko and PEEC. He told O'Shields that the pipeline should stop buying casinghead gas from the "white oil" operators.
 
 
 51
 Q. And Mr. O'Shields responded to you that he did not intend to change anything, didn't he?
 
 
 52
 A. Well, I can't say he responded exactly that way. He listened to what I had to say, said he wasn't, as I recall dimly, said he, you know, wasn't aware of the details and that is the last I heard of it. In other words, there was really very little response, almost no response from him. It just died.
 
 
 53
 Q. And he did not express any particular concern to you, did he, about this?
 
 
 54
 A. No.
 
 
 55
 Q. And as time went on you did not ever go back to the people at the pipeline again to raise this with them because you thought the subject was closed; isn't that right?
 
 
 56
 A. Yes.
 
 
 57
 Q. And you believed the decision had already been made; isn't that right?
 
 
 58
 A. Yes.
 
 
 59
 Q. And the pipeline company was going to continue to buy this gas; correct?
 
 
 60
 A. Yes. My assumption was that was the case.
 
 
 61
 Allison instructed his staff to keep tabs on the activities of Hufo and True, whom he characterized as "crooks"; several years after PEPL's need for gas had subsided and turned to a need to get rid of gas, Anadarko and PEEC brought this suit.
 
 
 62
 4. Confusion Below: Lessons in Law and Geology
 
 
 63
 (a) Defining "Casinghead Gas"
 
 
 64
 The parties agree that "casinghead gas" is, in the words of one of the plaintiff's title documents, "gas produced with oil from an oil sand, whether obtained from the casinghead of the well or from separators or otherwise," or in the words of the Texas statute, "any gas or vapor indigenous to an oil stratum and produced from the stratum with oil." Tex.Nat.Res.Code Sec. 86.002(10) (1978). Both sides agree that "sand" and "stratum" have the same meaning in this context. Each side, however, has a particular extension of the definition of "oil sand" or "oil stratum" that, if accurate, means that it wins the case based on undisputed facts. Also, each side has a fall-back argument based on disputed facts and the unembellished definitions just quoted.
 
 
 65
 The plaintiffs' addition is based on various statutes, regulations, and title documents: they assert that an "oil sand" is a formation capable of producing oil in commercial quantities. In other words, the plaintiffs assert that even gas produced with small but non-trivial quantities of oil from the same interval does not qualify as casinghead gas because the value of the oil is too small to justify production from the well. According to the plaintiffs, only when a well produces oil in sufficient quantity for the oil production alone to make the well profitable can the operator then legally produce casinghead gas with the oil. On this basis, the plaintiffs boldly assert they have "title" to the entire Brown Dolomite and Moore County Lime formation because those formations are incapable of producing oil in commercial quantities.[15]
 
 
 66
 The defendants, on the other hand, assert that an "oil sand" or "oil stratum" is synonymous with an "oil reservoir." They point out that the entire Panhandle Field is regulated by the Texas Railroad Commission as one reservoir, that all areas of the field (other than the topmost formation called the Red Cave) exhibit the same internal pressure and therefore are in communication with each other, and that the entire Panhandle Field is thus an associated reservoir of oil and gas. According to the defendants, any production of gas from a properly classified oil well in the Panhandle Field is ipso facto the production of casinghead gas, regardless of whether the oil comes from one horizon and the gas from another.
 
 
 67
 Finally, both sides argue about the actual geology of the Brown Dolomite and Moore County Lime formations, and about whether the defendants produced more than trace amounts of oil from the perforations they made in those predominantly gas-producing formations. The plaintiffs argue that the defendants in fact produced gas and only traces of oil from those formations;[16] and, of course, the defendants assert that they produced both oil and gas in the proper ratios from those formations.
 
 
 68
 Thus, there are three possible definitions of casinghead gas. Each side posits one definition, and then falls back to a common one. (1) The plaintiffs assert that an "oil sand" must produce oil in commercial quantities. All parties acknowledge that the casinghead gas from the defendants' wells was far more valuable than the oil produced, and that the wells did not produce enough oil to make them worth drilling for oil alone. Therefore, under their preferred definition the plaintiffs win. (2) The defendants assert that the entire Panhandle Field is an associated reservoir of oil and gas, that it is an "oil sand" or "oil stratum" within the meaning of the relevant definitions. Under this definition any properly classified oil well produces only casinghead gas. Therefore, because their wells were properly classified--at least there was sufficient evidence for the jury to conclude that they were properly classified--the defendants win. (3) Both sides acknowledge (at least implicitly) that the proper definition of "oil sand" or "oil stratum" may be any horizontal interval in any formation that produces any oil. If that definition is accurate, the only remaining question is the strictly factual one of whether the defendants' wells produced enough oil with the gas from the high perforations in the Brown Dolomite and the Moore County Lime. Each side asserts that, based on the geological facts they presented at trial, they win under this neutral definition.
 
 
 69
 (b) Geological Evidence
 
 
 70
 At trial, the parties presented sharply conflicting evidence on the geological facts. The plaintiffs' evidence tended to show: The Brown Dolomite and Moore County Lime formations are gas formations. While there are occasional small pockets of oil in the gas formations, the oil and gas in the Panhandle Field conform to the law of gravity, with the heavier oil in the lower formations and the lighter gas in the upper formations. The oil-gas contact--the horizontal level where the heavier liquid hydrocarbons and lighter gaseous hydrocarbons meet--is roughly uniform throughout the region, and occurs near the bottom of the Moore County Lime or the top of the Granite Wash. The defendants must have known that they were stealing the plaintiffs' gas because they tried to hide their illegal drilling and producing practices: while their well logs show that they penetrated their putative oil wells throughout the gas formations above the oil-gas contact, their public filings with the Railroad Commission omit reference to most of these high performations.
 
 
 71
 The defendants' evidence tended to show: There are small but producible quantities of crude oil throughout the Brown Dolomite and Moore County Lime formations trapped in cracks and fissures in the rock. There is no uniform gas-oil contact in the Panhandle Field; gas and oil exist in varying ratios throughout the vertical column. Wells drilled in nearby areas showed producible quantities of oil throughout the Brown Dolomite and Moore County Lime. The plaintiffs' gas wells--completed primarily in the Brown Dolomite and Moore County Lime but also in the Granite Wash--have long produced small quantities of crude oil (which the plaintiffs have failed to report to the Railroad Commission and to the royalty owners). The defendants' well logs show markings both where the wells were actually perforated and where the operator defendants considered penetrating; although no one is now certain, the public filings with the Railroad Commission may be a more accurate description of where the wells are perforated than the markings on the well logs. The plaintiffs' main expert recommended that a $1500 test be performed to determine at precisely what level certain wells were perforated, but the plaintiffs refused to pay for the test. In any case, the public filings clearly show perforations in the zones that the plaintiffs assert to be "gas" zones, so the defendants were not trying to hide anything. Finally, based on the plaintiffs' own yearly Railroad Commission submissions of data on well pressure versus production, the steady pressure decline in the plaintiffs' gas wells proves that there was no drainage from their wells throughout the period in which they claim the defendants were stealing huge quantities of their gas.
 
 B. The Trial, the Verdict, and the Appeal
 
 72
 In the words of one defendant's brief: "In the fall of 1985 PEEC and Anadarko sued everyone who had ever been remotely connected with the production and sale of oil and casinghead gas on [the disputed sections] ... with the notable exception of [their] sister corporation PEPL." The plaintiffs' main claim on the facts was for conversion of their gas, but the legal theories in the complaint ranged from trespass on personal property, common law fraud, civil conspiracy, and negligence to breach of the defendants' leases and gas sales contracts, with the plaintiffs tacitly presenting themselves as third-party beneficiaries. Virtually every party in the case was a citizen or resident of Texas, and almost every claim was based on Texas law. Federal jurisdiction, however, was pegged on a claimed violation--apparently de rigueur in commercial litigation these days--of the federal RICO statute,[17] with the remainder of the massive case dangling ponderously below, suspended by the doctrine of pendent jurisdiction.
 
 
 73
 The defendants quickly brought in PEPL on third-party complaints, asserting among other things that PEPL was an "alter ego" or agent of the plaintiffs. They raised a host of affirmative defenses and brought counter-claims analogous to the plaintiffs' offensive theories, alleging that the plaintiffs' gas wells had illegally produced their casinghead gas. The defendants also cross-complained against each other, but wisely settled their differences (at least temporarily) in order to present a unified defense at trial.[18]
 
 
 74
 The parties agreed to divide the case into separate liability and damages phases, and the liability trial began in September 1987. The district court directed verdicts for the bank defendants and Billy Mack Gideon upon completion of the plaintiffs' case-in-chief. After extensive testimony from the parties' principals and from a parade of experts on both sides of the geological questions, the court submitted to the jury 42 pages of instructions and 53 special interrogatories, many of which required separate answers for each of the 29 defendants.
 
 
 75
 The jury sent everyone packing. It rejected each of the plaintiffs' claims and each of the defendants' cross-claims. For good (if slightly inconsistent) measure, the jury found in favor of the defendants on all affirmative defenses--including entrustment, license, release, waiver, ratification, and estoppel--except the defense of laches.
 
 
 76
 The plaintiffs bring this appeal primarily on the basis of insufficient evidence to support the verdict and errors in the jury instructions. The defendants together defend the jury verdict, and some bring cross-appeals that we discuss as necessary.
 
 C. The Unasked and Unanswered Question
 
 77
 The most astonishing thing about this complex case is what has not been resolved. The jury was never asked the key questions: Did the defendants take the plaintiffs' gas? If so, did the plaintiffs consent to the taking, thus absolving the defendants of conversion?[19] If not, are the plaintiffs nevertheless bound by the consent of their authorized agents? If not, are they nevertheless bound (through some form of "corporate disregard" theory) by the consent of their corporate affiliate PEPL? As a matter of fact, the court did ask the jury these questions; but it asked them all at once !
 
 
 78
 Like the logic professor's request for a yes-or-no answer to the question "have you quit beating your wife?," the key interrogatory[20] asked the jury a complex question: did the defendants convert the plaintiffs' gas? Conversion was defined as taking without consent, and consent was defined to include consent by the plaintiffs or "their agents or alter egos, if any." Thus, the jury's finding of no conversion is profoundly ambiguous: did the jury find that the defendants did not take the plaintiffs' gas? or did it find that the defendants took the plaintiffs' gas but with plaintiffs' consent? or did it find (in true lawyerly fashion) that if the defendants took the plaintiff's gas, they did so with the plaintiffs' consent? or did it find that although the plaintiffs did not consent, their "agents or alter egos" consented?
 
 
 79
 Assuming that the taking issue was a question of fact for the jury under the neutral definition of "oil sand,"[21] we would have gladly affirmed a jury finding that the defendants extracted only casinghead gas or, more precisely, that the plaintiffs had failed to prove that the defendants had extracted anything other than casinghead gas. The parties gave the stalwart jury a highly technical and almost unmanageable task: determine both the geological structure underlying the disputed tracts and the nature of the hydrocarbons produced from the defendants' high perforations on the basis of elaborate, well-reasoned, convincing, and absolutely conflicting evidence and expert testimony.[22] As bearers of the burden of persuasion, by definition the plaintiffs assumed the risk of non-persuasion. In other words, the jury reasonably could have thrown up its hands and determined that, whatever the truth of the matter, the plaintiffs had failed to establish that their version was true; therefore, the defendants were entitled to win.
 
 
 80
 Unhappily, no such determination was made. More precisely, we cannot infer that it was made. Our duty is to consider the jury answers as a whole and to make sense of each in the context of the trial and the charge. Davis v. West Community Hospital, 755 F.2d 455, 465 (5th Cir.1985). If the jury had found no taking of the plaintiffs' gas, that would have ended the case. It would not have been necessary to answer any other interrogatories except those on counterclaims. On the other hand, if the defendants took the plaintiffs' gas but with their consent, then the affirmative defenses found by the jury are much more pertinent, and (as we shall see) they may be dispositive. Moreover, the plaintiffs recognized this part of the basic ambiguity in the conversion interrogatory and objected to it,[23] and the district court assured them that it would rule on the taking question--what the parties have called the "title" issue[24]--after the jury returned its verdict. Finally, the defendants do not contend on appeal that we should interpret the jury's answer to the conversion issue as a finding that they did not take the plaintiffs' gas. We therefore assume that in answer to the key interrogatory the jury determined only that if the defendants took the plaintiffs' gas, the plaintiffs (or some person or entity whose decision was binding on them) consented to it.
 
 
 81
 It remains to be seen whether the jury's finding of consent and its benediction of the various affirmative defenses can support the take-nothing verdict judgment.
 
 D. Consent to the Taking
 
 82
 The remaining issues are wound together in an analytic knot. Did the plaintiffs consent to the taking of their gas? Did their affiliate PEPL consent? Could PEPL consent for the plaintiffs, was it an agent of the plaintiffs or their "alter ego" such that its activities were binding on the plaintiffs? Are there sufficient reasons for disregarding the corporate distinctions between the plaintiffs and their parent and sister companies? Even if the jury finding of consent by the plaintiffs or its "agents or alter egos" is not legally supportable, are the plaintiffs nevertheless "estopped" from claiming conversion because of their own behavior or the behavior of their "agents or alter egos"?
 
 
 83
 In this section of the opinion, we will begin to untangle the knot by determining whether the jury's implicit finding of consent is supported in fact and law, and whether it alone can sustain the verdict. We hold that the finding of consent is supportable, and can sustain much of the verdict, but that the plaintiffs' consent ended at the latest upon commencement of legal proceedings against the defendants. In the following section, we will determine whether the affirmative defenses can sustain the remainder of the take-nothing verdict.
 
 1. Some Initial Problems with Consent
 
 84
 (a) Remaining Ambiguities in the Interrogatory
 
 
 85
 We have already commented on the ambiguities inherent in the jury's finding of no conversion and held that we would construe it to be a finding of "taking with consent" rather than a finding of "no taking." But a further ambiguity remains: did the jury find that the plaintiffs consented, or that their agents consented, or that their alter egos consented? The instruction would have permitted the jury to answer "no" if it found any or all of these. The question now is: what happens if we find only one or two but not all three of these possible findings legally sufficient? The parties have not raised or briefed this issue--the plaintiffs because they never admit even for the sake of argument that any of these findings is legally sufficient, the defendants because they never admit even for the sake of argument any is not sufficient. "Thus we have one more small failure of the adversary system, which relies so heavily on the parties to do the requisite research and analysis." Mobil Chemical Co. v. Blount Brothers Corp., 809 F.2d 1175, 1183 n. 8 (5th Cir.1987).
 
 
 86
 In contrast to their precise objection to the ambiguity on the taking issue,[25] the plaintiffs did not object to this inherent ambiguity in the conversion charge. Instead they simply argued the "inclusion of a reference to agency or alter ego is not part of a proper definition of conversion" and that neither the agency nor the "alter ego" theories should be submitted to the jury. In subsequent objections to similar language in the instructions on the affirmative defenses, the plaintiffs did point out the problem of discerning whether the jury would find that the plaintiffs consented or that PEPL consented, and did ask generally for a separate instruction on agency and alter ego, but there was no mention of the need to distinguish between agency and alter ego.[26] A party must ordinarily object precisely to the wording of jury instructions and interrogatories,[27] and it is doubtful under these strict standards whether the plaintiffs' objections were adequate.
 
 
 87
 On the other hand, when a case is submitted to the jury on a general verdict, the failure of evidence or a legal mistake under one theory of the case generally requires reversal for a new trial because the reviewing court cannot determine whether the jury based its verdict on a sound or an unsound theory. See, e.g., Nowell ex rel. Nowell v. Universal Electric Co., 792 F.2d 1310, 1312 (5th Cir.), cert. denied, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986); Smith v. Southern Airways, Inc., 556 F.2d 1347 (5th Cir.1977). Our Court has recognized that even a single question in a special verdict involving alternative theories has the same troublesome characteristic: the reviewing court cannot tell which theory formed the basis of the jury's categorical answer. See Dougherty v. Continental Oil Co., 579 F.2d 954, 960 n. 2 (5th Cir.1978), vacated, 591 F.2d 1206 (5th Cir.1979). In consequence, we have reversed and remanded for a new trial when an interrogatory contained a complex question and the jury's categorical answer could have been to either or both of the sub-questions. See Prudential Insurance Co. v. Morrow, 339 F.2d 411, 412 (5th Cir.1964).[28] It seems likely that in the case of a potentially ambiguous general verdict all the complaining party must do to protect his rights is to object to the charge and the submission vel non of the questionable theory or theories; probably he need not object to the ambiguity inherent in its submission, as the ambiguity arises from the nature of general verdicts and no party has a right to a particular kind of verdict, general or special.
 
 
 88
 Thus, if we analogize the submission of the conversion interrogatory to the submission of a general verdict on several alternative theories, we might conclude that the plaintiffs' objection to the submission of each theory is enough to preserve for appeal the argument that the case must be retried because one theory is unsound and it is impossible to tell which theory was the basis for the jury's answer. If, however, we apply the normal strict rules requiring objection to the form of the charge and interrogatories, we might conclude that the plaintiffs' objections were inadequate to preserve the error and that the verdict can be sustained based on any one of the possible alternative grounds. We are thus confronted by a close and difficult question.
 
 
 89
 Happily, we can leave its resolution to another day. Even on appeal the plaintiffs fail to argue that the cause should be reversed and remanded for retrial if we find any one of the alternate theories of consent legally insupportable. They maintain the all-or-nothing posture that none of the possible findings of consent was legally supportable; they do not argue in the alternative that if one is unsound the case must be remanded because we cannot determine if the jury relied on the unsound theory. We need not consider issues or arguments not raised in the appellant's brief. See In re Texas Mortgage Service Corporation, 761 F.2d 1068, 1073-74 (5th Cir.1985). We conclude that we may affirm the jury's finding of consent if any one of the underlying theories is legally and factually sufficient.
 
 
 90
 (b) Consent: Element of Conversion or Affirmative Defense?
 
 
 91
 In its definition of conversion, the district court instructed the jury that "the complaining party must prove that each offending party took the gas owned by the complaining parties without their assent." The plaintiffs argue that the court erred by requiring that they prove lack of consent, rather than requiring the defendants to prove consent as an affirmative defense. The plaintiffs contend that consent is a species of the genus "assumption of the risk" and that under Rule 8(c)[29] and Texas authority[30] they were not required to show lack of consent.
 
 
 92
 There may be some confusion in Texas law about which party must prove or disprove the existence of consent.[31] After reviewing the cases cited by the defendants, however, we conclude that although the matter is not without doubt, the district court properly required the plaintiffs to show lack of consent.
 
 
 93
 Conversion is a tort against the possession of property. Taking another's property is not conversion; wrongful taking is. Older Texas authority and some modern cases speak of the owner's lack of consent as the sine qua non of wrongful taking:
 
 
 94
 When the word "conversion" is used to signify a tort, it may be defined as any distinct act of dominion wrongfully asserted over another's personal property in denial of the owner's rights or inconsistent with them. The essence of conversion is not the actual taking of the owner's property or carrying it away; it is wrongfully depriving the owner of its use and possession. The taking must be wrongful, for without the element of wrong no tort can be committed and conversion does not occur. To be wrongful, the conversion [sic[32]] must be wholly without the owner's sanction or assent, either expressly or impliedly.
 
 
 95
 Staats v. Miller, 240 S.W.2d 342, 344 (Tex.Civ.App.--Amarillo), rev'd on other grounds, 150 Tex. 581, 243 S.W.2d 686 (1951).[33] Thus, the Texas courts have held that for venue purposes the tort of conversion does not occur where the taking occurred if the taking was with consent; while these are venue cases, they broadly and categorically define the tort of conversion in terms of the lack of consent. See, e.g., Conlee Seed Co. v. Brandvik, 526 S.W.2d 795, 798 (Tex.Civ.App.--Amarillo 1975, no writ) ("there can be no conversion by the taking of property where the owner has expressly or impliedly consented to the taking"); American Mortgage Corp. v. Wyman, 41 S.W.2d 270, 272 (Tex.Civ.App.--Austin 1931, no writ) ("It is indispensable to the maintenance of the cause of action for conversion for the complaining party to prove that the original taking of the property was without his consent.").
 
 
 96
 Because only wrongful taking is conversion, and because the lack of consent establishes the wrongfulness of the taking, lack of consent is an element of the tort of conversion which the plaintiff must plead and prove. Affirmative defenses usually have the structure of "confession and avoidance," that is to say, they admit the initial sufficiency and completeness of the claim while asserting other grounds for avoiding the normal consequences of that concession. But if the defendant to a conversion claim was required to prove that the plaintiff consented, rather than requiring the defendant to show that although a conversion occurred he has some legal excuse for it, that would be requiring him to prove that no conversion occurred at all. This analysis is consonant with traditional common law treatment of the problem.[34] Therefore, we conclude that the district court did not err in requiring the plaintiffs to show lack of consent.
 
 
 97
 2. Who Consented?
 
 
 98
 At trial, the defendants presented three factual and legal bases for the finding that the plaintiffs consented to the taking of their gas. First, the defendants argued that the plaintiffs and their affiliate PEPL were "alter egos" and that the acts of PEPL were therefore binding on the plaintiffs. Second, the defendants contended that PEPL was an agent of the plaintiffs and that its acts were therefore binding on the plaintiffs as principals. Third, the defendants asserted that through their corporate management the plaintiffs themselves consented to the taking. Technically, of course, the last contention is also an agency argument, but it is quite different from the second.
 
 
 99
 Presumably because of PEPL's extensive knowledge of and participation in much of the activity of which the plaintiffs complain, most of the arguments on appeal focus on the first two theories, particularly the issue of corporate disregard and to a lesser extent the issue of the pipeline as an agent of the plaintiffs. It seems to us, however, that the issue is most easily resolved by focusing on the evidence of the plaintiffs' own consent to the taking of the gas through their corporate management. Because of the nature of the consent issue, the other theories present difficulties.
 
 3. Consent by the Plaintiffs
 
 100
 The evidence recited above in section A.3 speaks for itself. It supports the conclusion that Dixon, head of plaintiff PEEC, decided to sacrifice the plaintiffs' gas rights in order to advance the interests of their much larger and more profitable sibling PEPL; that Allison, head of plaintiff Anadarko, objected to this strategy and complained to O'Shields; and that O'Shields, head of all the Panhandle companies, sided with Dixon and the interests of PEPL, making the final decision to allow PEPL to buy gas that all suspected was in part stolen from Anadarko and PEEC.
 
 
 101
 Dixon, Allison, and O'Shields were the CEOs of PEEC, its parent Anadarko, and Anadarko's parent Panhandle Eastern Corporation, respectively; and O'Shields was Chairman of the Board of most Panhandle companies. These men had the power and the duty to maximize profits for the entire family of corporations. Just as they once transferred PEPL wells to PEEC to increase the price that the family could receive for the gas, they had the power to risk gas losses by the plaintiffs in order to help PEPL in its time of gas shortage. Whether, as a matter of their duties of care and loyalty to the plaintiffs, they should have so decided is a different question, which we discuss briefly below. The point here is that they had the power and authority to act for the plaintiffs, even to their detriment; and they did so.
 
 
 102
 To find that the plaintiffs consented to the taking, the jury did not need to find that the plaintiffs' management was happy to give away the gas in return for an increased gas supply to the pipeline; it did not need to find that management was totally satisfied with this arrangement; it did not need to find that CEO Allison did more than acquiesce in the decision by Dixon and O'Shields. The word "consent" is used interchangeably in Texas tort jurisprudence with the word "assent"; both words connote acquiescence in a decision or a state of affairs.[35] The jury needed only to conclude that the plaintiffs' management accepted the loss of gas in order to further other corporate goals. There was evidence to support that conclusion, and we affirm it.
 
 
 103
 4. The Plaintiffs' Arguments Against the Finding of Consent
 
 
 104
 (a) The Part-Time Agent and the Adverse Agent
 
 
 105
 The plaintiffs make two arguments against the jury's finding that they consented. The first is that their corporate management's knowledge of and acquiescence in the defendants' taking should not be imputed to them because, in the words of their brief:
 
 
 106
 even when the agency relationship is established, the acts of an agent will not bind the principal absent proof the agent was acting within the course and scope of its authority and in the best interest of the principal.
 
 
 107
 * * *
 
 
 108
 * * *
 
 
 109
 It is equally well established in Texas, knowledge of an officer or director of one corporation that is acquired while acting as an officer or director of another corporation is not imputable to the first corporation. Furthermore, where an officer or director is adversely interested in a transaction, his or her knowledge is not imputable to the corporation at all, even though the officer is, at the time, the managing agent of the corporation.
 
 
 110
 (Emphasis in original; citations omitted.) This breaks down into two contentions. (1) The knowledge of Dixon and O'Shields and others about the defendants' activities cannot be imputed to the plaintiffs because these officers were working for PEPL or for Panhandle Eastern Corporation at the time they acquired this information. (2) Because their management's decision to acquiesce was clearly adverse to the plaintiffs' interest and because it harmed them, the knowledge and acts of their corporate officers cannot be imputed to the plaintiffs.
 
 
 111
 One hundred years ago Texas law concerning the knowledge of an agent acquired outside the scope of his agency was as narrow as the plaintiffs now contend. The law has since changed, however, as the exception has swallowed the rule. The exception began chewing on the rule in cases like Wellington Oil Co. v. Maffi, 136 Tex. 201, 150 S.W.2d 60 (1941). In Maffi, the Supreme Court's analysis begins by noting the expansive rule of the Restatement of Agency (First) and various legal encyclopedias which stated that the principal is always bound by the actual knowledge of his agent no matter how acquired. The Maffi opinions continues:
 
 
 112
 This court has not adopted so broad a statement of the rule. The rule has been announced by this court that a principal, whether a corporation or a natural person, is not affected by notice which comes to the agent or officer unless such knowledge came to him while he was transacting the business of his principal. Texas Loan Agency v. Taylor, 88 Tex. 47, 49, 29 S.W. 1057 [ (1895) ]; Teagarden v. Godley Lumber Co., 105 Tex. 616, 154 S.W. 973 [ (1913) ]. While this court has announced that as the general rule, it has in subsequent decisions recognized an exception thereto which seems also to be recognized in practically all jurisdictions. That exception is that where the agent is the actor (sometimes designated sole actor), representing his principal in the transaction to which his knowledge relates, the principal will not be permitted to avail himself of the benefits of his agent's services without being charged with his knowledge.
 
 
 113
 Maffi, 136 Tex. at 207, 150 S.W.2d at 63 (citations omitted). The Maffi "exception" obviously makes an enormous inroad into the "general rule." See United States Fidelity & Guaranty Co. v. San Diego Bank, 155 S.W.2d 411, 413 (Tex.Civ.App.--El Paso 1941, writ ref'd w.o.m.) (absent allegation of fraud by agent, notice to person acting for both plaintiff and defendant held to have been notice to both plaintiff and defendant).
 
 
 114
 By the time of Fireman's Fund Indemnity Co. v. Boyle General Tire Co., 392 S.W.2d 352, 356 (Tex.1965), the Texas Supreme Court still gave lip service to the ancient rule while effectively ignoring it. In Fireman's Fund the Court held an insurance company bound by knowledge its insurance agent had acquired while selling policies for another company. It mentioned Maffi and recited the old rule, but cited as an unqualified "exception" to the old rule the general rule of the Restatement that Maffi had tried to distinguish. So by the time of Fireman's Fund the transformation was complete: Texas now follows the Restatement rule which imputes all knowledge of an agent (except that acquired in confidence) to his current principal.
 
 
 115
 The plaintiffs also contend that their corporate management's consent was against their interests and thus cannot be imputed to them. This argument suffers from two shortcomings. First, the cases cited in support of this argument relate to self-dealing by corporate officers. If a corporate officer is raiding the corporate treasury, the courts not surprisingly refuse to hold that the corporation acquiesced in the theft because the thief knew of his own misdeeds! In this case, the plaintiffs' officers and directors may well have harmed the plaintiffs (viewing the plaintiffs as purely abstract entities) but they did so to help the plaintiffs' sole owner Panhandle Eastern Corporation and its related entities. We would hesitate to reify the corporation fiction to the point where a manager's decision to help the sole shareholder at the expense of the corporation would violate some surrealistic duty of care or loyalty.
 
 
 116
 The second error in the plaintiffs' argument is even more fundamental: it is a category mistake. The plaintiffs' analogy to self-dealing goes to the rights of the corporation versus its management. It does not affect the complete authority of management to bind the corporation in its dealing with others. In other words, if the plaintiffs' managers actually consented to the taking of the plaintiffs' gas, then the plaintiffs actually consented because their management had full authority to act for them; and in fact they could act in no other way. Even assuming that the managers, while acting in the scope of their authority, did something that was so harmful to the plaintiffs as to violate the management's duty of care or loyalty, that violation only gives rise to liability to the plaintiffs; it does not absolve the plaintiffs of the responsibility to third parties for their management's acts.
 
 
 117
 In this case, the jury found that the plaintiffs' management consented to the taking, and that consent is real and binding on the plaintiffs even if the consent was so harmful to the plaintiffs' interests that they could now sue their managers for deciding to consent.
 
 
 118
 (b) Lack of Full Knowledge
 
 
 119
 The plaintiffs' second argument is that, even assuming their management knew of the possibility of the defendants stealing gas and did nothing, that failure to act is not consent because, again in their own words (and emphasis), consent "requires full knowledge and appreciation of the risk being voluntarily assumed." The plaintiffs cite for this proposition Brown v. Lundell, 162 Tex. 84, 344 S.W.2d 863 (1961). Because the plaintiffs' managers were not certain that the defendants were stealing their gas, they now argue that they could not have consented to the taking.
 
 
 120
 In Brown v. Lundell, the oil lessor had agreed to let the oil operator/lessee dispose of salt water and other drilling wastes in an earthen pit on the lessor's property. The salt water percolated down into the fresh water table, diminishing the value of the lessor's land. On suit for recovery of the lost value, the defendant oil operator argued that the lessor's consent to disposal of the salt water and waste in the earthen pit foreclosed her recovery under the principle of volenti non fit injuria. The court disagreed, noting first that while there was no doubt of consent to the use of the waste pit, what the defendant had "failed to allege and prove is that the lessor had reason to know or to be aware that the salt water would probably percolate downward and pollute the fresh water supply."
 
 
 121
 [N]o further issue was requested as to whether she [the lessor] was aware of the probable pollution. The doctrine of "volenti non fit injuria" presupposes a knowledge of the facts so that the actor has a choice. In this case it cannot be said that the lessor assumed a known and appreciated risk.
 
 
 122
 Brown, 162 Tex. at 93, 344 S.W.2d at 869, 870 (citations omitted; emphasis added). The language in Brown demonstrates what common sense would suggest in its absence: consent to a tort can arise even without absolute certainty as the occurrence of the tort. In our case, although the plaintiffs were not certain they strongly suspected the defendants of stealing their gas. They acquiesced in the taking to benefit their owner Panhandle Eastern Corporation and their affiliate PEPL. The plaintiffs' suspicions were strong enough to make the risk "known and appreciated," and thus to support the jury's finding that they consented.
 
 
 123
 5. When Did the Plaintiffs' Consent End?
 
 
 124
 The jury was entitled to find that the plaintiffs' management, fully aware that the defendants might be stealing gas, acquiesced in the defendants' actions to further the purposes of the Panhandle Eastern family of corporations. Consent is a unilateral act, however; and it can be withdrawn. The defendants' response to the problem is not a model of clarity, but to the extent that they contend that the plaintiffs could not withdraw their unilateral consent, the argument does not merit discussion. To the extent that the argument has merit, we address it below: if the plaintiffs could not withdraw their "consent" (or apparent consent), it could only have been on grounds of the affirmative defenses of estoppel, ratification, or waiver.
 
 
 125
 The question remains: when did the plaintiffs stop assenting to the takings? As we have interpreted the jury's finding of no conversion, the jury found that the consent never ceased. This conclusion is flatly contrary to the evidence and we cannot uphold it on appeal: the plaintiffs' consent obviously ended at least at the time that this lawsuit was filed! It probably ended much sooner, but that is not the question we must answer.
 
 
 126
 Our answer depends on two considerations. First, as we concluded above, the plaintiffs had the burden of proving their lack of consent. Second, our power of review is limited to overturning only those factual conclusions which no reasonable juror could reach.[36] Because of this, we must determine, not when the plaintiffs' consent actually ceased, but rather the time at which the jury's conclusion of continuing consent became completely unreasonable under the evidence.
 
 
 127
 It seems to us that a reasonable juror could conclude that lack of consent was not proved until the plaintiffs actually filed this lawsuit.[37] There was powerful evidence of consent by the plaintiffs during the time of the PEPL-Hufo/True gas supply contract. There was also evidence that Dixon knew he was on shaky ground in cancelling the burdensome multi-million dollar 15-year Hufo contract, and that he feared a lawsuit by True; the jury could have inferred that concern about this big-ticket counter-claim was a reason why Dixon and O'Shields and others decided not to do anything about the mounting evidence that True was stealing the plaintiffs' gas. There is no dispute that employees of plaintiffs began to develop evidence against the defendants and began to assert positions contrary to those of the "white oil" operators in other legal proceedings early on; but a reasonable juror could conclude that none of this proved that the plaintiffs' earlier consent to the takings had ended. The jury could have inferred that while the plaintiffs' management instructed its employees to begin preparing the case against the casinghead gas operators in anticipation of a future lawsuit, it was reluctant to shift the Panhandle companies from being an eager purchaser of the casinghead gas to an eager litigant claiming ownership of it. A reasonable juror could have determined that once the defendants had clearly established the plaintiffs' consent to the takings during the time of the PEPL contract, the plaintiffs then had to show by some positive evidence that their consent ceased at a particular time. The plaintiffs' decisions to intervene in the Phillips and Stowers proceedings and the actions by their employees to gather evidence on the defendants' activities do not necessarily establish a corporate change-of-heart--or so a reasonable juror could have concluded.
 
 
 128
 Therefore, the jury's finding of no conversion is legally supportable up to the filing of this case. The defendants produced some gas between the time this suit was filed and the time the wells were shut in; thus, the defendants' liability for conversion remains in question. We turn now to the affirmative defenses raised by the defendants and accepted by the jury.
 
 
 129
 E. General Affirmative Defenses: Estoppel, Ratification, and Waiver
 
 
 130
 The court instructed the jury on four affirmative defenses raised by all defendants: waiver, ratification, estoppel, and laches. The jury found for the plaintiffs on the issue of laches, but found for all defendants on the issues of estoppel, ratification, and waiver. The plaintiffs assert that these findings cannot stand under the law and the facts of this case.
 
 
 131
 The defendants' affirmative defenses turn on the jury's implicit finding that PEPL was the agent of the plaintiffs or that the corporate distinction between the plaintiffs and their affiliate should be disregarded. The idea is that the plaintiffs are estopped from claiming their rights, or have ratified the behavior of the defendants, or have waived the right to complain of the defendants' behavior by virtue of the acts of their affiliate PEPL in purchasing some of the allegedly converted gas.[38] We have already discussed some problems in the jury's corporate disregard and agency findings in relation to the issue of consent; but here we must undertake a more complete analysis of those issues.
 
 
 132
 In this section we first review the law of corporate disregard under Texas law; we conclude that under one version of corporate disregard the jury was entitled to attribute the behavior of PEPL to the plaintiffs. Taking up the substance of the equitable affirmative defenses, we determine that while they are valid to a limited extent they cannot support the take-nothing judgment past the time when plaintiffs' consent to the taking ceased.
 
 1. The Problem of Corporate Disregard
 
 133
 (a) The Theories of Corporate Disregard
 
 
 134
 The law of "corporate disregard" was summarized and reshaped by the Texas Supreme Court not long ago in Castleberry v. Branscum, 721 S.W.2d 270 (Tex.1986). The Court began its analysis with a general remark, then listed specific grounds:
 
 
 135
 We disregard the corporate fiction, even though formalities have been observed and corporate and individual property have been kept separately,[39] when the corporate form has been used as part of a basically unfair device to achieve an inequitable result. Specifically, we disregard the corporate fiction: (1) when the fiction is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where the corporate fiction is resorted to as a means of evading an existing legal obligation; (4) where the corporate fiction is employed to achieve or perpetrate monopoly; (5) where the corporate fiction is used to circumvent a statute; and (6) where the corporate fiction is relied upon as a protection of crime or to justify wrong.
 
 
 136
 Id. at 271-72 (citation and footnotes omitted). Immediately following this passage, the Court inserted a footnote containing a seventh ground,[40] which we list here for completeness: (7) where the corporation is inadequately capitalized.
 
 
 137
 The Castleberry opinion is puzzling. It begins with a most general principle--"when the corporate form has been used as part of a basically unfair device to achieve an inequitable result"--then follows with a laundry list of seven relatively detailed rationales that intertwine and overlap, yet point in various directions. We think we can fairly discern, however, three distinct strands of corporate disregard under Texas law. As we shall see, each has a different application in this case.
 
 
 138
 One strand we may call "alter ego" proper, "(2) where a corporation is organized and operated as a mere tool or business conduit of another corporation." The phrase "alter ego" has often been (and still is) used as a generic term for corporate disregard or "veil-piercing," but the Castleberry opinion makes clear that "alter ego" is a particular kind of rationale for corporate disregard. See Riquelme Valdes v. Leisure Resource Group, Inc., 810 F.2d 1345, 1354 (5th Cir.1987). The focus of alter ego proper is on the legal adequacy of the corporation's existence, and the relationship between the corporation and its controlling corporation or individual. Many wholly-owned subsidiary and closely-held corporations are not factually distinct from their owners;[41] many are in fact controlled and operated in close concert with the interests of the owners, and do not have a distinct factual existence--separate employees, separate offices, separate properties, etc. That is perfectly natural and proper. See, e.g., Edwards Co. v. Monogram Industries, 730 F.2d 977 (5th Cir.1984) (en banc) ("shell" subsidiary was formally distinct and creditor was not misled; corporate disregard under Texas law was therefore improper). The problem arises when such a corporation is not treated as legally distinct, when, in other words, the owners neglect to maintain the formal existence of the corporation as required by law.[42] "Alter ego's rationale is: 'if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors.' " Castleberry, 721 S.W.2d at 272 (quoting Ballantine, Corporations Sec. 123 at 294 (1946)).
 
 
 139
 Castleberry states the rationale for alter ego purely in terms of reciprocal fairness, but clearly the rule is also designed to give incentives to those using the corporate form to obey the state's laws fully by maintaining corporate formalities, and thus the legal separateness, of the corporation. Persons who fail to maintain full corporate formalities cannot expect the state to grant them the limited liability that flows from the corporate form. The person invoking alter ego proper against a corporation, whether claiming in contract or tort, thus may be the recipient of a windfall. In theory, even if the corporation was adequately capitalized and even if the claimant did not rely on the financial backing of the corporation's owners, the claimant is still entitled to recover as a sort of private attorney general. Of course, the different species of corporate disregard seldom occur in pure form, so alter ego usually will be accompanied by assertions of unfairness to the claimant. But our present purpose is to isolate analytically the strands of the doctrine, and there is nothing in the alter ego strand to suggest that anything more is required than the failure of the owners to maintain the corporation as a distinct legal entity. The focus of alter ego proper is on the relation between the corporation and its owners and not on the relation between the corporation and the claimant.
 
 
 140
 The second strand of corporate disregard relates to the use the corporate form as a technique for avoiding legal limitations on natural persons or corporations--we will call this the "illegal purpose" strand of corporate disregard. Looking at the Castleberry list, "(5) where the corporate fiction is used to circumvent a statute" and "(4) where the corporate fiction is employed to achieve or perpetrate monopoly" are directly within this strand, while others overlap somewhat or fit indirectly: "(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong"; "(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation." Here again, as with alter ego proper, the focus is on the relation between the corporation, its owners, and the laws of the state rather than on the relation between the claimant and the corporation; and, again, recovery by the claimant may be a windfall because the claim may be unrelated to the illegal purpose. Still, it makes sense to refuse to allow owners to limit liability with the corporate form--even from unrelated civil claims--when the corporation is an instrument of illegality. Illegal purpose disregard differs from alter ego, however, because it can be used even when all corporate formalities have been kept. There are few cases that illustrate this strand of corporate disregard in any pure form; in practice, the illegal purpose rationale is usually an alternative basis in an alter ego or "sham to perpetrate fraud" case.
 
 
 141
 The third strand traditionally goes under the name "sham to perpetrate fraud,"[43] or as Castleberry puts it, "(1) when the fiction is used as a means of perpetrating fraud"; elements of this strand can be found in "(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation" and "(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong." For tort claimants, this strand includes the concept of inadequate capitalization as a basis for corporate disregard. Here for the first time the focus is on some inequitable result for the claimant because of something about the corporate form. But what is that "something" that allows disregard? Castleberry is emphatic that this category allows corporate disregard in a much broader range of cases than cases of fraud strictly speaking. The opinion clings at times to the term "constructive" fraud, but its reasoning is much broader:
 
 
 142
 The basis used here to disregard the corporate fiction, a sham to perpetrate a fraud, is separate from alter ego. It is sometimes confused with intentional fraud; however, "[n]either fraud nor an intent to defraud need be shown as a prerequisite to disregarding the corporate entity; it is sufficient if recognizing the separate corporate existence would bring about an inequitable result."
 
 
 143
 Castleberry, 721 S.W.2d at 272-73 (citations omitted). The Court goes on to emphasize that the standard for corporate disregard is whether honoring corporate separateness would result in "inequity" or "injustice," that the purpose " 'is to prevent use of the corporate entity as a cloak for fraud or illegality or to work an injustice, and that purpose should not be thwarted by adherence to any particular theory of liability.' " Id. at 273. Castleberry specifically holds that the question of injustice or inequity is a question of fact for the jury.
 
 
 144
 The only limitation on this broad strand of corporate disregard is that the focus is on injustice or unfairness to the claimant caused by the corporation and its owners. The unfairness must be something greater than the mere failure to recover a full measure of damages; for example, the running of the statute of limitations as to a tort victim who simply sued the wrong related entity is not enough. See Lucas v. Texas Industries, Inc., 696 S.W.2d 372 (Tex.1984). In contract cases (or in any case based on deliberate acts), the inequity frequently comes from reasonable reliance on the financial backing of the owners. Without reliance, the contract claimant cannot avoid the risk of insolvency that it originally accepted as part of the bargain. See, e.g., Bell Oil & Gas Co. v. Allied Chemical Corp., 431 S.W.2d 336 (Tex.1968); Edwards Co. v. Monogram Industries, 730 F.2d 977 (5th Cir.1984) (en banc).
 
 
 145
 (b) Corporate Disregard in this Case
 
 
 146
 The defendants raised and the court submitted to the jury all three forms of corporate disregard. The sum total of jury instruction on the difficult question of corporate disregard was the following paragraph:
 
 
 147
 Whenever these instructions or any issues submitted to you refer to "alter ego" you shall consider the following instructions. One corporation or company is the alter ego of another if it is organized and operated as a mere tool or business conduit of another corporation or company. A corporation or company is also the alter ego of another if it is necessary to disregard the separate corporate entity in order to prevent the accomplishment of a wrong. A company or corporation is also the alter ego of another if the corporation fiction [sic ] is used to circumvent a statute.
 
 
 148
 The instructions on everything from conversion to negligent misrepresentation thereafter referred to "the plaintiffs, their agents, or alter egos, if any,"[44] implicitly referring the jury back to this instruction.
 
 
 149
 Turning first to the "mere tool or business conduit" instruction, this was an attempt to instruct the jury on alter ego proper. The focus of alter ego is on the relationship between the corporations whose identities are sought to be collapsed. At all times relevant to this dispute, Anadarko, PEEC, and PEPL were run as separate and legally distinct corporations. All corporate formalities were maintained. The mere fact of interlocking directorates and officers cannot make corporations into alter egos; nor does the normal exercise of the rights and powers incident to ownership raise the alter ego question of whether the corporation was a "mere tool or business conduit" of its owners. There was simply no evidence in this case of any improprieties in the manner in which the plaintiffs and their parent or affiliate were operated, and the alter ego issue should not have been submitted to the jury.
 
 
 150
 As to the instruction that the corporate fiction could be disregarded if "used to circumvent a statute," the defendants made the following argument to the jury and again (as quoted from their brief) on appeal:[45]
 
 
 151
 Plaintiffs' wells were depleted and they could only have fulfilled PEPL's great need for more gas by drilling additional wells. RRC [Railroad Commission] rules and regulations prohibited plaintiffs, as gas rights owners, from drilling more than one well per section, however. By contracting with Hufo, encouraging Hufo to speed up its drilling and production, and buying the gas Hufo and later True produced, PEPL and plaintiffs avoided these restrictions.
 
 
 152
 This argument does not withstand a moment's scrutiny. From the time this lawsuit was filed to the filing of the last brief on appeal, the defendants have maintained with absolute consistency that they did nothing wrong, that they did not violate Texas statutes, that they did not violate Railroad Commission rules and regulations, and that they did not take gas that belonged to the plaintiffs. But if that is true, then the plaintiffs themselves could have acquired the oil rights and drilled the same oil wells using the same kind of production practices--and that would have been absolutely legal and indeed irreproachable. Yet according to the defendants, the plaintiffs and PEPL were somehow circumventing Texas rules and regulations by simply purchasing casinghead gas from the defendants' legal oil wells. This will not wash.
 
 
 153
 If the defendants were willing to concede for the sake of argument that their wells were illegal wells, then the plaintiffs and PEPL could be argued to have encouraged the illegal production of their own dry gas to circumvent the regulatory restrictions on drainage. The defendants were entitled to plead and prove in the alternative, but they simply have not done so. They have never conceded for any purpose that their wells violated Texas law. That refutes their "circumvention" argument.
 
 
 154
 Finally, the court instructed the jury to disregard the separate existence of the plaintiffs and PEPL "if it is necessary ... in order to prevent the accomplishment of a wrong." This instruction reflects the mis-named "sham to perpetrate a fraud" strand of Texas corporate disregard law. Castleberry makes clear that under Texas law the question of unfairness or injustice to the claimant caused by the use of separate corporate entities is for the jury. In a federal diversity court, the question of sufficiency of the evidence is governed by federal law,[46] so the question we now face is whether a reasonable juror could have concluded that allowing recovery by the plaintiffs for gas allegedly stolen by the defendants and then sold to the plaintiffs' affiliate PEPL would be allowing the Panhandle family of corporations to use the corporate form "as part of a basically unfair device to achieve an inequitable result." Castleberry, 721 S.W.2d at 271.
 
 
 155
 The "sham to perpetrate a fraud" basis for corporate disregard was properly submitted to the jury. The plaintiffs do not dispute that if they had purchased gas from the defendants, they would be estopped from suing the defendants for converting that gas. The basis for estoppel in such a case, of course, is the inequity of allowing a claim by a person who has benefited from the very transaction that he now seeks to assert as a cause of harm. In our case, rather than treating the rights and property of each subsidiary as distinct and inviolable, the management of the various Panhandle entities decided to allocate unequally among the various corporations the costs and benefits of acquiring the casinghead gas; costs were shifted to the plaintiffs and benefits shifted to PEPL. The plaintiffs now propound their corporate separateness and separate rights as absolute. Because of this profound asymmetry in the behavior of the managers of the plaintiffs and their affiliates, a reasonable juror could conclude that now " 'recognizing the separate corporate existence would bring about an inequitable result.' " Id. at 273.
 
 
 156
 (c) The Adequacy of the Instructions and Objections
 
 
 157
 The plaintiffs argue that no corporate disregard issue should have been submitted to the jury at all. They assert that corporate disregard theory can be used only "offensively," that under Texas law only creditors or victims seeking to satisfy unpaid debts or losses too large for the corporate defendant to pay can avail themselves of the doctrine of corporate disregard in order to find a deeper pocket. In this case, of course, the defendants use the doctrine "defensively"; they seek to defend against the plaintiffs' claims by pointing to the behavior of their affiliate PEPL. We do not find the limitation urged by the plaintiffs anywhere stated in Texas law, however; and given the Castleberry Court's encompassing definition of "sham to perpetrate a fraud," we will not interpose such a limitation ourselves. Furthermore, the defendants point to cases where the use of corporate disregard can properly be characterized as "defensive." See, e.g., First Nat'l Bank in Canyon v. Gamble, 134 Tex. 112, 116-22, 132 S.W.2d 100, 102-05 (1939) (suit on nominally expired note secured by deed of trust; held: debtor's affiliate with subsequent deed of trust on same property would normally have priority over facially expired lien, but, because of actual notice to affiliate and substantial unfairness to first lienholder, corporate forms would be disregarded to disallow affiliate's assertion of a superior lien).
 
 
 158
 We confront here the same problem that we faced above with consent: The plaintiffs objected to each of the three theories of corporate disregard submitted to the jury (although the defendants correctly point out that their objections were vague and conclusory). Once again, we have determined that not all of the theories are supported by the evidence. Because we cannot tell whether the jury relied on the sound or the unsound theories, we are presented with the dilemma of whether we should affirm a verdict that might have been based on error. But, once again, we can escape between the horns of the dilemma because the plaintiffs have adopted an all-or-nothing strategy on appeal; they have not argued that the verdict must be reversed and remanded for a new trial if we find fault with one or more of the bases of corporate disregard. See In re Texas Mortgage Services Corporation, 761 F.2d at 1073-74.
 
 
 159
 We have serious doubts whether the court's bare one-sentence instruction on "sham to perpetrate a fraud"--"a corporation or company is also the alter ego of another if it is necessary to disregard the separate corporate entity in order to prevent the accomplishment of a wrong"--adequately apprised the jury of its task under Texas law. On the other hand, the plaintiffs' objections to this instruction were weak if not inadequate. We can escape this dilemma also: Our resolution of the corporate disregard issue renders it superfluous because we find that it does not protect the defendants from liability beyond the time when the jury could find that the plaintiffs consented.
 
 2. Sham to Perpetrate a Fraud
 
 160
 (a) Estoppel
 
 
 161
 There are many forms of "estoppel" in American law--estoppel based on an unbargained-for promise (promissory estoppel), estoppel based on representations of fact (equitable estoppel or estoppel in pais), and in some jurisdictions even estoppel based purely on a course of conduct;[47] but through all forms of estoppel runs the a common thread: the element of reliance. "The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change in position is sternly forbidden." Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618 (1880). Texas does not except itself from the general view that reliance is an element of estoppel,[48] and in this respect the jury instructions correctly restated Texas law.[49]
 
 
 162
 In this case, there are simply no facts to support the view that the defendants relied on promises, representations, or behavior of the plaintiffs or of PEPL when they decided to do anything relevant to this lawsuit.[50] The defendants were independent and experienced businesses, doing their best to make money by drilling for, producing, selling, and buying gas. This they would have done with or without PEPL's purchases of gas from the operator defendants. The defendants have always asserted and continue to assert that their wells are legal oil and casinghead gas wells, that their actions in drilling, completing, and producing from these wells are totally legal; they took all these actions based on their assessment of the law and of the geological facts and have never harbored doubts about the legality of their acts that were somehow assuaged by the plaintiffs or PEPL. The defendants have not pointed to even a stitch of evidence that they would not have acted exactly as they have acted if the plaintiffs or PEPL had promised, represented, or behaved differently in any respect.
 
 
 163
 (b) Ratification and Waiver
 
 
 164
 To their credit, the defendants do not argue--at least not directly--that they relied on anything done by the plaintiffs or PEPL. Instead, they attempt to support the jury's finding of estoppel by pointing to cases that contain a different principle that also goes by the same name in Texas; a representative statement of the principle is found in Turcotte v. Trevino, 499 S.W.2d 705, 712 (Tex.Civ.App.--Corpus Christi 1973, writ ref'd n.r.e.):
 
 
 165
 It is appellees' contention that the appellants (or their predecessors) accepted benefits under the 1960 will, electing to take under such will, and by electing to take under such will are now estopped from impeaching the instrument. Where one having the right to accept or reject a transaction takes and retains benefits thereunder, he ordinarily ratifies the transaction, is bound by it, and cannot avoid its obligation or effect by taking a position inconsistent with it at a later time.
 
 
 166
 As the quotation makes obvious, this principle is not based on the opposing party's reasonable reliance (although reliance may occur in such situations); rather, it turns on the notion that under certain conditions inconsistent behavior by a legal actor will not be permitted. This kind of "estoppel" is thus indistinct from the principles of "ratification" or "election" and "waiver" of rights. Thus in Mapco, Inc. v. Pioneer Corp., 447 F.Supp. 143 (N.D.Tex.1978), aff'd on other grounds, 615 F.2d 297 (5th Cir.1980), for example, the plaintiff claimed the right to extract hydrocarbons from a certain supply of natural gas. The plaintiff, however, had on behalf of one defendant transported in its pipeline the very hydrocarbons that it claimed to own with full knowledge of their source, and it continued to accept payments and transport them through the time of trial. The district court concluded:
 
 
 167
 There is an implied condition that he who accepts a benefit under an instrument must adopt the whole of it, conforming with all of its provisions, and renouncing every right inconsistent with them." Simmons v. Clampitt Paper Co., 223 S.W.2d 792 (Tex.Civ.App.--Dallas 1949, writ ref'd n.r.e.). In the instant case [plaintiff] Mapco cannot accept benefits for transporting liquid hydrocarbons for Koch and at the same time dispute AOC's right to extract same and thereby AOC's right to sell the same to Koch.
 
 Mapco, 447 F.Supp. at 150.[51]
 
 168
 Once we collapse the distinction between the plaintiffs and PEPL, there is no doubt that this ratification/waiver strain of estoppel bars the plaintiffs from recovering damages for the gas purchased from the defendants by PEPL. That is precisely the kind of inconsistent behavior that the law does not allow.
 
 
 169
 PEPL's purchases ended in 1983, however, and by finding that True's agreement to end the contract was not given under duress,[52] the jury found that PEPL terminated the contract lawfully. Except for the defendants' contract with PEPL, there is no "transaction" with which the plaintiffs' claims are inconsistent. Therefore, the ratification/waiver strain of estoppel does not sustain the take-nothing verdict.
 
 
 170
 The closest the defendants come to a winning position is their assertion that PEPL "encouraged" and facilitated Hufo's exploration and production. If PEPL, in order to get more gas out of the disputed sections, had suggested to Hufo that it drill casinghead gas "oil" wells, maximize its production of gas, and sell the gas to PEPL, we would have a different case. In such a case it could be urged that even after it ceased buying gas, PEPL and its affiliates would be barred from complaining about those casinghead gas wells that they helped bring into existence; in other words, the drilling and production of the wells was the relevant "transaction" that could not be later disavowed by PEPL or its affiliates. Nothing like that happened in this case. Hufo began to drill the wells before PEPL came on the scene. Hufo approached PEPL because he had sold gas to it before, but clearly he would have searched for another buyer had PEPL not been interested. The operator defendants were independent businesses out to make a profit. They testified that their wells were legitimate, that they had done nothing wrong in drilling and producing them; and the overwhelming inference is that they would not have behaved any differently whether or not PEPL had agreed to purchase the gas. Given that, it does not violate the principles of ratification or waiver for one Panhandle company to buy some of the gas or for other Panhandle companies later to sue for conversion, as long as the companies that sue do not recover for conversion of the gas purchased by their affiliate.[53]
 
 
 171
 It is our duty to affirm a jury verdict if legally possible, and we have looked high and low for a theory that would make PEPL's decision to buy gas eternally binding on the plaintiffs. We have not found it.
 
 
 172
 3. Conclusion: The Sufficiency of the Jury Verdict
 
 
 173
 In sum, the jury's finding of consent by the plaintiffs and "ratification" by the plaintiffs through the inconsistent behavior of their affiliate PEPL are supported by sufficient evidence. The consent to the taking, however, ended at the very latest at the commencement of this litigation. Furthermore, the pipeline's behavior was not inconsistent with an assertion of rights by the plaintiff at that late time. Therefore, we must remand for trial the question whether the defendants converted the plaintiffs' gas after the time this suit began.
 
 F. Separate Affirmative Defenses
 
 174
 The common defenses raised by all the defendants are not legally and factually sufficient to sustain the jury's verdict. Particular defendants, however, raised unique affirmative defenses. We must now examine them to determine if the jury's verdict can be sustained as it relates to those defendants.
 
 1. Mitchell's Unique Reliance Claim
 
 175
 In general, the defendants do not argue that they actually relied on PEPL's behavior in deciding to drill for, produce, sell, or buy the disputed casinghead gas. Mitchell's case (and its subsidiary LEC's, by extension[54]) is somewhat different; it presented evidence to the jury that it actually relied on PEPL's behavior. First, Mitchell Transmission and Processing Division president Withers testified that, in proceeding with the True contract, he "certainly relied" on PEPL vice president Kelley's statement that he (Kelley) had no objections to Mitchell's proposed contract with True. Second, PEPL sold Mitchell some used compressors knowing that they would be used in processing True's casinghead gas. Third, Mitchell presented evidence to the jury of the amount that it spent installing the gas processing plant ($12 million) and the money it lost on the deal ($9 million). Mitchell could have presented these facts to the jury to bolster its defense of estoppel. It could have argued that Withers' reasonable reliance on Kelley's implied representations was a proximate cause of Mitchell's decision to build the plant, and thus caused its (contingent) liability for conversion of the plaintiffs' gas. We must consider, on the basis of these unique facts and the jury's general determination that the plaintiffs were estopped from suing the defendants, whether the jury's take-nothing verdict can be sustained as to Mitchell.
 
 
 176
 It cannot. Mitchell chose to submit the actual reliance issue to the jury under the guise of a negligent misrepresentation claim against PEPL. The jury's instructions on negligent misrepresentation include the elements of equitable estoppel based on actual reliance,[55] and the jury found in favor of PEPL. Mitchell has not appealed the jury's decision. We will not second-guess Mitchell's presentation of its own case, and we will not read the jury's general finding of estoppel in favor of all defendants to have a special meaning when applied to Mitchell.
 
 2. Entrustment, License, and Release
 
 177
 Houston Natural Gas Corporation ("HNG") and Mitchell argued at trial that they were protected by the sales provisions of the Uniform Commercial Code because the plaintiffs (or their agents or "alter egos") had "entrusted" possession of the disputed hydrocarbons to True, True was a hydrocarbon merchant, and HNG and Mitchell were buyers in the ordinary course of business. See Tex.Bus. & Com.Code Ann. Sec. 2.403(b) (Vernon 1968) ("Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business."). Also, Mitchell argued that the plaintiffs through PEPL had released all legal claims against it when PEPL expressed approval of its gas purchase agreement with True.
 
 
 178
 These defenses are quite distinct, but they have a common problem from our current perspective. In each case the defendants have to show that some unilateral or bilateral act by the plaintiffs or PEPL was forever binding on the plaintiffs. HNG and Mitchell cannot make this showing.
 
 
 179
 Their entrustment claim was based on an assertion that the plaintiffs and PEPL acquiesced in True's retention of casinghead gas. The defendants essentially concede in their briefs that the entrustment ceased at the time suit was filed against True. So the entrustment defense cannot rescue HNG or Mitchell from further proceedings.
 
 
 180
 Mitchell's release claim suffers from a somewhat different problem. Mitchell argues that the plaintiffs or PEPL "released" claims against it when PEPL "released" to it the gas it was purchasing from True. This is no better than a pun, and a confusing one at that. The "release" that Mitchell seeks to establish is an implied contract between it and PEPL (and the plaintiffs, by way of corporate disregard) that extinguishes the plaintiffs' legal rights in exchange for some benefit to PEPL and the plaintiffs. PEPL's "release" of the gas to Mitchell was figurative only; PEPL simply agreed with True to terminate their gas purchase contract, and what True chose to do with the gas afterward was none of PEPL's business. Even assuming the jury was given enough information to appreciate this distinction,[56] the facts do not support a finding of release. Instead, the facts show that PEPL decided to terminate its contract with True before Mitchell came on this scene. PEPL told True that it wanted to end the contract; that is why True was seeking other buyers. True told Mitchell, and Mitchell's Withers called PEPL's Kelley to verify True's assertion. Withers asked Kelley if he had any objection to Mitchell's purchasing gas from True, and Kelley said no. Kelley's statement may have been false, it may have been misleading, it may have been such that Mitchell could and did reasonably rely on it, both parties may have been pleased to hear what the other had to say, and each may have benefited (at least initially) from the other's unilateral decision; but the decisions were unilateral. There was no exchange, no quid pro quo, no bargain between Mitchell and PEPL. Therefore, there was no binding contract of release.
 
 
 181
 The license defense suffers from a combination of the problems with release and entrustment. To the extent Mitchell argues that PEPL and the plaintiffs unilaterally granted a license to buy gas from True, the implied license was revocable at will and was revoked (at the latest) when the plaintiffs filed suit against True. To the extent Mitchell argues that the "license" is a bilateral contract, with the license supported by consideration and thus irrevocable, we simply cannot sustain the factual basis of the argument: there was no contract, implied or otherwise, between Mitchell and PEPL or the plaintiffs.
 
 
 182
 None of the unique affirmative defenses can sustain the judgment. Mitchell and HNG remain in the case on remand.
 
 G. The Cross-Appeals
 
 183
 The district court directed verdicts in favor of the bank defendants and Billy Mack Gideon. After trial, First National Bank in Albuquerque ("FNBA") and Mr. Gideon filed motions requesting sanctions against the plaintiffs for bringing claims that were not well-founded in fact and law. At the end of its response to Mr. Gideon's motion, the law firm that had represented the plaintiffs in the early part of these proceedings requested attorney's fees for having to respond. The court denied both motions, sanctioning Gideon $500 for filing a "frivolous" Rule 11 motion. The court did not state whether the $500 sanction was based on Rule 11 or on equitable grounds. FNBA and Gideon appeal the denial of their Rule 11 motions, and Gideon appeals the sanction levied upon him by the district court.
 
 
 184
 We doubt whether the district court's denial of Rule 11 sanctions to FNBA and Gideon amounts to an abuse of discretion, but the propriety of the court's award of sanctions against Mr. Gideon seems to us a much closer question. Because we must remand other portions of this case, however, we feel the best course is to vacate the sanction against Gideon and remand all the Rule 11 questions to the district court for reconsideration in light of our recent comprehensive opinion in Thomas v. Capital Security Services, Inc., 836 F.2d 866 (5th Cir.1988) (en banc).
 
 H. Conclusion
 
 185
 For the reasons given, the jury's verdict can stand to the time the plaintiffs first filed suit against the operator defendants. Past that point, some of the defendants' liability is still up in the air.[57]
 
 
 186
 Our following comments are meant to assist the district court on remand, not to trammel its judgment: they are not a binding part of our decision. We have not found it necessary to determine the proper definition of casinghead gas; our comments in section A.4(a) and elsewhere in this opinion may help guide that decision, but they do not finally resolve it. The district court should note that the Texas Railroad Commission's examiners have treated the problem of high perforations in the Panhandle Field as a factual problem of whether the oil operators have perforated above the gas-oil contact. See Proposal for Decision, Motion by the Railroad Comm'n to Repeal Previous Orders in the Panhandle Field, Tex.R.R. Comm'n Oil & Gas Div., Docket No. 10-87,017 (Mar. 21, 1988). This approach to the problem obviously figures in arriving at the proper definition of casinghead gas. Also, the parties should brief to the district court the collateral effects of this Commission proceeding, if any. Moreover, the district court should bear in mind that the defendants' wells may have ceased to be statutory oil wells as their condition deteriorated. The court should consider whether the defendants' gas production, even if previously legal, became conversion of the plaintiffs' gas if and when the defendants' wells ceased to be legal oil wells. Assuming that the "title" issue--what we have sometimes called the "taking" issue--is bound up with questions of fact, the parties are entitled to a jury trial on the issue. If this case ever belonged in federal court, we wonder whether it continues to; all federal issues are gone, and should the parties desire to try the case to another jury from scratch, the district court should consider whether there remains a sufficient level of judicial economy to maintain pendant jurisdiction over the case. In this vein, the district court may wish to consider whether the abstention doctrine of Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), has any bearing on this case. Should the parties elect to retry the case to the court, or to submit it to the court based on the evidence adduced at trial, some of these considerations may diminish or disappear.
 
 
 187
 All claims not addressed in this opinion have been fully considered and found to be either superfluous, given our disposition, or without merit. Therefore, unless noted to the contrary in this opinion, the judgment is affirmed. For the sake of absolute clarity, we explicitly affirm the verdicts directed in favor of the bank defendants and Billy Mack Gideon.
 
 
 188
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 [1]
 Although we set out both sides of key factual disputes, for the sake of brevity we recite the facts from a perspective favorable to the defendants since the jury's findings in their favor must be upheld unless completely unreasonable. See Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc)
 
 
 [2]
 In order to encourage exploration for and production of new sources of natural gas, the Natural Gas Policy Act of 1978 ("NGPA"), Pub.L. No. 95-621, 92 Stat. 3350 (1978), codified at 15 U.S.C. Secs. 3301-3432, lifted government-imposed price restrictions on gas from new gas wells. Older wells subject to price regulation are referred to as "dedicated" wells because federal law regulates gas reserves "dedicated to interstate commerce" before the date of the NGPA. See 15 U.S.C. Sec. 3314. Consequently, new wells and purely intrastate wells have been dubbed "undedicated" wells and the price of gas from those wells is allowed to fluctuate freely based on market forces. During the months of peak production from the defendants' wells, the plaintiffs' "dedicated" gas sold for substantially less than the defendants' "undedicated" gas
 
 
 [3]
 See, e.g., Colorado Interstate Co. v. Hufo Oils, 802 F.2d 133 (5th Cir.1986) ("white oil" should not be counted as oil for well classification purposes); Dorchester Gas Producing Co. v. Harlow, 743 S.W.2d 243 (Tex.App.--Amarillo 1987, no writ) (upholding jury verdict of conversion by oil operator; holding that Texas Railroad Commission did not have primary jurisdiction over conversion claims and that wells properly classified as oil wells can still be used to convert gas owner's gas); Amarillo Oil Co. v. Energy-Agri Products, 731 S.W.2d 113 (Tex.App.--Amarillo 1987, writ granted, Sept. 23, 1987) (upholding jury verdict of no conversion by oil operator; holding that conversion claim was an impermissible collateral attack on well classification and that the Railroad Commission had primary jurisdiction over the case); In re Stowers Oil & Gas Co., 32 F.E.R.C. p 61,043 (opinion and order), 30 F.E.R.C. p 63,107 (1985) (recommended decision) (holding that casinghead gas was improperly extracted from reserves dedicated to interstate commerce under federal gas law)
 
 
 [4]
 See Final Order, Application of Phillips Petroleum Co., Tex.R.R. Comm'n Oil & Gas Div., Docket No. 10-77,314 (May 13, 1985) (only naturally occurring liquid hydrocarbons may be counted as oil for well classification purposes), aff'd sub nom Hufo Oils v. Railroad Comm'n of Texas, 717 S.W.2d 405 (Tex.App.--Austin 1986, no writ); Proposal for Decision, Motion by the Railroad Comm'n to Repeal Previous Orders in the Panhandle Field, Tex.R.R. Comm'n Oil & Gas Div., Docket No. 10-87,017 (Mar. 21, 1988) (setting out criteria for determining the oil-gas contact; generally barring perforations by oil operators above the oil-gas contact)
 
 
 [5]
 It appears that there are deeper producing formations than the Granite Wash, but none relevant to this lawsuit
 
 
 [6]
 See supra note 2
 
 
 [7]
 While this practice seems to us questionable on its face, Texas regulators apparently did not see it that way. The Railroad Commission staff had issued opinion letters which required that LTX liquids be counted as oil for purposes of initial well testing and subsequent GOR calculations, and others that permitted the practice. For example, one 1977 opinion letter from the Commission's chief lawyer stated:
 To restate the position as this office sees it the Commission has taken the position that all stabilized liquid hydrocarbons produced on a lease, including any that are separated on the lease through the use of absorption or refrigeration units and commingled in lease storage with oil produced, are considered to be oil and may be used in the calculation of gas oil ratios.
 Letter from Fred Young, Chief Legal Counsel (emphasis in original). Some members of the Commission and staff apparently held contrary views. These disagreements were resolved in the Phillips proceeding, see supra note 4, but the use of LTX units for creating "oil" clearly was not as dubious a practice as it at first appears.
 
 
 [8]
 Bolder oil operators asserted that they could produce gas from any vertical zone with or without oil from that zone as long as the total production of the well met the statutory GOR requirements. See Read v. Britain, 422 S.W.2d 902, 903 (Tex.1967) (dicta: "Casinghead gas is gas produced from an oil well simultaneously with the production of oil.") This argument has so far not met with approval in the Texas courts. See Dorchester Gas Producing Co. v. Harlow, 743 S.W.2d 243, 250-51 (Tex.App.--Amarillo 1987, no writ). It is not absolutely clear from the opinion, but it appears that in Harlow the oil operator conceded (or the jury found) that the Brown Dolomite is a purely gas-indigenous formation. The court calls the Brown Dolomite a gas formation and treats the factual issue of the geology of the Brown Dolomite as not in dispute, at any rate
 
 
 [9]
 See Final Order, Application of Phillips Petroleum Co., Tex.R.R. Comm'n Oil & Gas Div., Docket No. 10-77,314 (May 13, 1985) (only naturally occurring liquid hydrocarbons may be counted as "oil" for well classification purposes), aff'd sub nom Hufo Oils v. Railroad Comm'n of Texas, 717 S.W.2d 405 (Tex.App.--Austin 1986, no writ)
 
 
 [10]
 The administrative proceeding dealing with the "high perf" issue finally began in early 1986, but the Railroad Commission had been receiving complaints about it for several years. See Proposal for Decision, Motion by the Railroad Comm'n to Repeal Previous Orders in the Panhandle Field, Tex.R.R. Comm'n Oil & Gas Div., Docket No. 10-87,017 (Mar. 21, 1988)
 
 
 [11]
 "Mcf" represents a thousand (1,000) cubic feet of gas
 
 
 [12]
 See infra section A.3
 
 
 [13]
 "Casinghead Gas" was defined in the contract as "all of Seller's interest in gas which is produced from a reservoir in association with crude oil or is dispersed in and in intimate contact with crude oil and may be legally produced from a well classified as an oil well by the Texas Railroad Commission." In a section of the contract labeled "Title," the parties agreed that: "Seller warrants ... that it has good title to the gas delivered to Buyer hereunder free and clear of any and all liens, encumbrances and claims whatsoever ... and that Seller has good right and lawful authority to sell the same."
 Perhaps because Hufo had not yet modified its written mineral lease which restricted its operations to the Granite Wash and Red Cave formations, an appendix entitled "Schedule of Contract Acreage" the contract stated that "Acreage is committed to Buyer with respect to gas produced from the Granite Wash and Red Cave formations." It is not at all clear whether this clause was meant to simply track the current lease provisions, or to protect PEPL from subsequent legal problems, or to protect Hufo from being obligated to supply gas from formations which it had not yet explored. There is no dispute, however, that Hufo and its successor True later delivered and PEPL accepted gas that was produced from all formations.
 
 
 [14]
 See supra note 7. Former Chief Legal Counsel Fred Young testified by deposition that his well-known opinion letter was intended to apply to gas processing facilities like the one installed by Mitchell
 
 
 [15]
 The plaintiffs never quite make clear whether their assertion about the Brown Dolomite and Moore County Lime is purely legal or purely factual or a little of both. At times they seem to argue that as a matter of fact oil is not found in commercial quantities in the Brown Dolomite and Moore County Lime. At other times they seem to argue that regardless of whether any oil operator could in fact complete a oil well in those formations that was economically feasible on the basis of the oil production alone, the formations have been established by law as gas formations by various legislative and regulatory acts, as recognized in the party's title documents. This ambivalence is understandable, as each position has a weakness: the factual assertion could be radically undermined by increased demand and rising prices in the market for oil; the legal assertion is counter-intuitive because it amounts to the assertion that, regardless of the actual geological facts, long-held beliefs about the facts by oilmen and Texas authorities controls what appears to be a factual question: are the formations productive of oil or gas or both?
 For a treatment of these matters that understandably suffers from the same shortcomings, see Dowling, White Oil and Greenback Dollars: An Overview of Controversies Surrounding Production of Gas from the Panhandle Field of Texas, 19 St. Mary's L.J. 81 (1987) (plaintiffs' definition of casinghead gas propounded in an article by an attorney from plaintiffs' law firm).
 
 
 [16]
 The plaintiffs also argue that even if the defendants produced gas with oil from the Brown Dolomite and Moore County Lime, that they did so in violation of various Texas regulations that require different producing intervals to be sealed off from one another. Even if the plaintiffs' argument is correct, however, it is not clear how that violation benefits the plaintiffs. It does not follow from the failure to seal off that the defendants converted the gas from any given interval, nor does it seem likely that the plaintiffs can bring a lawsuit rather than an administrative claim to complain of such alleged violations of the Railroad Commissions rules
 
 
 [17]
 Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Secs. 1961-68 et seq
 
 
 [18]
 Canadian Commercial Bank was insolvent and in receivership in Canada at the time of trial. Before trial, the district court denied its motion to dismiss on grounds of international comity, and a panel of our Court held that it had no jurisdiction over an attempted appeal from the interlocutory order. See Pan Eastern Exploration Co. v. Hufo Oils, 798 F.2d 837 (5th Cir.1986). We need not review the validity of the district court's ruling that CCB could be sued in Texas in view of our decision to uphold the directed verdict entered in its favor
 
 
 [19]
 We will refer to the "taking" tort as the tort of conversion. The jury was also asked to determine whether the defendants had "trespassed" on the plaintiffs' gas rights. The instructions, however, assured the jury that "the elements establishing liability for conversion will also establish liability for trespass to personal property" but that "trespass requires a showing of even less interference with one's right to possession than does conversion." For the remainder of this opinion we will refer to the wrongful taking asserted by the plaintiffs as the tort of conversion. The defendants either took the plaintiffs' gas or they did not, so nothing turns on any asserted distinction between conversion and trespass
 
 
 [20]
 The instruction on conversion reads:
 The essence of conversion is wrongful deprivation of property. In order for you to find for a particular party and against any other parties on a claim for conversion, you must find that the offending party wrongfully exerted dominion, ownership or control over the complaining party's property to the exclusion of that complaining party. A conversion may be committed by the acts of an agent or alter ego. Conversion involves a taking of property without the owner's consent; hence, the complaining party must prove that each offending party took the gas owned by the complaining parties without their assent, or without the assent of their agents or alter egos, if any, expressed or implied, by words or by conduct.
 In answer to the question "Do you find that one or more of the Defendants has converted the Plaintiffs' gas? Answer 'yes' or 'no,' " the jury answered "No."
 
 
 [21]
 This is disputed; see supra section A.4(a)
 
 
 [22]
 Whatever one might think in general about the utility of the institution of the civil jury, a case such as this inevitably raises questions about its limitations
 
 
 [23]
 As the plaintiffs pointed out in a preface to a proposed issue on "title," "The title issue will not be resolved by the global conversion and trespass issues because a finding of no trespass and no conversion could be based on a finding of consent to such trespass and conversion."
 
 
 [24]
 Perhaps some of the confusion over the taking issue stems from the plaintiffs somewhat obscure way of naming and dealing with it. The plaintiffs refer to the taking issue as one of who had "title" to the gas. The problem is that no one disputes that the plaintiffs had "title" to all non-casinghead gas and that some defendants had "title" to all oil and casinghead gas on the sections in dispute. The plaintiffs' "title" argument is really one or the other or all of three arguments why all the gas produced by the defendants was their gas: First, as we have noted, they claim that it is per se illegal to complete oil and casinghead gas wells in the Brown Dolomite and Moore County Lime formations because by law those formations are not "oil sands." Second, they argue that as a matter of contract law, the parties who formed the agreements by which the current owners acquired their title to the mineral estates intended that the Brown Dolomite and Moore County Lime formations be off-limits to the owners of the oil and casinghead gas rights. Third, they argue that as a matter of fact the defendants' wells did not produce their "casinghead" gas with oil from an oil sand, and any jury finding to the contrary is not supported by the evidence. We do not find it helpful to consider these arguments as presenting questions of "title."
 
 
 [25]
 See supra note 23
 
 
 [26]
 In their objection to the instruction on the affirmative defense of waiver, the plaintiffs argued:
 No issue of agency or alter ego between Plaintiffs and PEPL is or can be supported by the evidence, and this is supported by the fact that Defendants have not even attempted to submit a specific, general "agency" or "alter ego" issue which would allow the jury to expressly consider those matters, choosing instead to "hide" such matters within other issues and thereby avoid close, specific scrutiny of Defendants' true position by the jury. Simply stated, all references to agency or alter ego or what any party contends should be deleted. If the Court requires that the instructions such as these be submitted, then they should be submitted so that the jury shall determine separately: 1) whether Plaintiffs themselves gave up any right or undertook any complained-of act or omission; 2) whether PEPL gave up any right of Plaintiffs' (as opposed to rights of PEPL) or undertook any complained-of act or omission; and 3) if PEPL did so, whether it was acting as a duly authorized agent of Plaintiffs at the time in the course and scope of its authorization and in Plaintiffs' best interests. (Henceforth, this Objection in its entirety will be referred to as "Objection No. 1").
 The plaintiffs thereafter made "Objection No. 1" to several other affirmative defenses.
 
 
 [27]
 Fed.R.Civ.P. 51 ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."); J.C. Motor Lines, Inc. v. Trailways Bus System, 689 F.2d 599, 603 (5th Cir.1982) ("we have consistently held that a party who fails to object to the form of special interrogatories cannot complain for the first time on appeal")
 
 
 [28]
 Cf. Laguna Royalty Co. v. Marsh, 350 F.2d 817, 824 (5th Cir.1965) (discussing problem of a "semi-general" verdict in the context of a Rule 60(b) motion); but see ADP-Financial Computer Services v. First Nat'l Bank, 703 F.2d 1261, 1266-67 (11th Cir.1983) (affirming ambiguous jury finding based on the adequacy of one of the jury's two possible determinations)
 
 
 [29]
 The Rule contains a list of affirmative defenses and a catch-all phrase at the end:
 In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations waiver, and any other matter constituting an avoidance or affirmative defense.
 Fed.R.Civ.P. 8(c).
 
 
 [30]
 The only Texas case that plaintiffs cite for this proposition--Shell Petroleum Corp. v. Liberty Gravel & Sand Co., 128 S.W.2d 471, 474 (Tex.Civ.App.--Beaumont 1939, no writ)--does not support it. In that case, the defendant had a mineral lease on property that was senior to the plaintiff's gravel and sand lease on the same property. The defendants moved the plaintiffs' sand to drill an oil well, and in the process damaged it and decreased its commercial value. In an action for trespass on personal property based on the removal of the sand, the court held that even if under the leases the defendant had the right to move the sand and could only be found liable if it had negligently caused damage, the defendant could not raise the issue because it was an affirmative defense to a trespass action. Since the defendant had pled only a general denial, it could not raise any affirmative defense. We fail to see what this case has to do with consent and conversion
 
 
 [31]
 The encyclopedia authors, for example, appear to side with the defendants when they begin their discussion of the "Elements of Conversion" with the statement: "Conversion involves a taking of property without the owner's consent; hence there can be no conversion where the owner has expressly or impliedly assented to the taking or disposition." 15 Tex.Jur.3d Conversion Sec. 3 (1981) (footnote omitted). But under the heading "Defenses," the same article states: "There is no conversion where a person takes only what he is entitled to receive, [or] takes with the owner's knowledge and consent...." Id. at Sec. 24 (footnotes omitted). It is worth noting, however, that the heading of section 24 is "Defenses" and not "Affirmative Defenses." Moreover, although the cases cited by the defendants are not absolutely clear, the plaintiffs have not cited any cases that even hint to the contrary
 
 
 [32]
 The court surely means "taking" here rather than "conversion": a "conversion" is wrongful by definition; a "taking" is made wrongful (and becomes conversion) by lack of consent
 
 
 [33]
 See also Lone Star Beer, Inc. v. Republic Nat'l Bank of Dallas, 508 S.W.2d 686, 687 (Tex.Civ.App.--Dallas 1974, no writ); Lone Star Beer, Inc. v. Republic Nat'l Bank of Odessa, 468 S.W.2d 930, 933 (Tex.Civ.App.--El Paso 1971, writ ref'd n.r.e.)
 
 
 [34]
 Consent ordinarily bars recovery for intentional interferences with person or property. It is not, strictly speaking, a privilege, or even a defense, but goes to negative the existence of any tort in the first instance. It is a fundamental principle of the common law that volenti non fit injuria--to one who is willing, no wrong is done.... As to intentional invasions of the plaintiff's interests, his consent negatives the wrongful element of the defendant's act, and prevents the existence of a tort. "The absence of lawful consent," said Mr. Justice Holmes, "is part of the definition of an assault." The same is true of false imprisonment, conversion, and trespass
 Prosser & Keeton on Torts 112 (5th ed. 1984).
 
 
 [35]
 Webster's defines the verb consent: "to give assent or approval: AGREE syn ASSENT" and the noun: "compliance in or approval of what is done or proposed by another: ACQUIESCENCE"; the verb assent: "to agree to something esp. after thoughtful consideration: CONCUR" and the noun: "an act of assenting: ACQUIESCENCE, AGREEMENT." Webster's New Collegiate Dictionary 67, 241 (1973)
 
 
 [36]
 See Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc)
 
 
 [37]
 The first filing of the various cases that merged into this suit was a complaint filed by the plaintiffs in the True bankruptcy proceedings on August 17, 1985. That is the date upon which the jury's finding of consent became legally unsupportable
 
 
 [38]
 The defendants' arguments on the equitable defenses can be interpreted to include the contention that, even without the participation of PEPL, the plaintiffs' claims should be barred by equity. It is clear, however, that the plaintiffs themselves did not actively take any action which could be construed as ratifying the defendants' acts or waiving their own rights. The most that can be said against the plaintiffs is that they knew of the defendants' allegedly wrongful acts and did nothing for so long a time that it would be inequitable to allow them to sue. This is, of course, simply a claim of laches, and the jury specifically found against the defendants on that ground. Since the defendants have not appealed that jury finding, we limit ourselves to examining the equitable arguments based on PEPL's behavior as attributed to the plaintiffs
 
 
 [39]
 This clause is misleading. It appears to exclude the case of classic "alter ego," i.e., "disregarding" the corporate existence when there really is no legal or formal separate existence because of complete domination by the owners, co-mingling of funds, flaws in corporate formalities, etc. Yet, as the Supreme Court makes clear later in the opinion, "alter ego" is one of the grounds of corporate disregard listed by the Court just below--specifically, ground number (2). "[A]lter ego is only one of the bases for disregarding the corporate fiction: 'where a corporation is organized and operated as a mere tool or business conduit of another corporation.' " Castleberry, 721 S.W.2d at 272
 
 
 [40]
 "Inadequate capitalization is another basis for disregarding the corporate fiction." Castleberry, 721 S.W.2d at 272 n. 3
 
 
 [41]
 We use the term "owners" loosely to mean those in actual control of the corporation that the claimant seeks to disregard. There may be situations in which a corporation is dominated and controlled by persons who are not the nominal owners--or even the real owners. See Riquelme Valdes v. Leisure Resource Group, Inc., 810 F.2d 1345, 1354 (5th Cir.1987)
 
 
 [42]
 In the words of Castleberry:
 Alter ego applies when there is such a unity between corporation and individual [or parent corporation] that the separateness of the corporation has ceased and holding only the corporation liable would result in an injustice. It is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes.
 Castleberry, 721 S.W.2d at 272 (citations omitted). In addition to legal formalities, formal sufficiency includes adequate capital; thus Castleberry 's seventh reason in its laundry list of reasons for corporate disregard--inadequate capitalization--is closely related to alter ego, although it also fits comfortably in the third strand of corporate disregard discussed below.
 
 
 [43]
 Pace Corp. v. Jackson, 155 Tex. 179, 195, 284 S.W.2d 340, 351 (1955)
 
 
 [44]
 The phrase "alter ego" is certainly much easier to use in a decent English sentence than "disregarding the corporate fiction"; but it is now a misstatement of Texas law to use "alter ego" as a generic description of corporate disregard. The plaintiffs never objected to this usage in the district court, however, and in fact used it themselves
 
 
 [45]
 The defendants raise an additional argument on appeal that this lawsuit itself was an elaborate attempt to circumvent pricing restriction because the plaintiffs asked for damages based on the higher non-dedicated gas prices. This argument was not made to the jury so we pay it no heed
 
 
 [46]
 See Boeing Co. v. Shipman, 411 F.2d 365, 368-70 (5th Cir.1969) (en banc)
 
 
 [47]
 See, e.g., Times-Mirror Co. v. Superior Court of Los Angeles County, 3 Cal.2d 309, 44 P.2d 547 (1935)
 
 
 [48]
 See Turcotte v. Trevino, 499 S.W.2d 705, 716 (Tex.Civ.App.--Corpus Christi 1973, writ ref'd n.r.e.) (it is an "essential element" of estoppel that the person asserting it must have been "put in a worse condition" by the behavior of the person he seeks to estop)
 
 
 [49]
 The instruction on estoppel reads:
 Defendants contend that Plaintiffs are estopped from claiming that the gas produced from the wells in question is the property of plaintiffs. You are instructed that estoppel requires a false representation or concealment of a material fact made with actual or constructive knowledge of the fact, to a party without knowledge of the fact, with the intention that it should have been acted upon, and that the party to whom it was made must have relied upon or acted upon it to his prejudice. You are further instructed that one who has accepted and retained the beneficial part of a transaction with full knowledge of the facts is estopped to repudiate the disadvantageous part thereof, or to assert a right inconsistent with the provision of the transaction. In connection with this issue, you shall take into account the words or conduct of Plaintiffs, their agents, and their alter egos, if any, which you may find to be their alter ego.
 (Emphasis and bracketed material added.)
 
 
 [50]
 The gas processing defendants do have a reliance argument with some support in the record; their particular claims are discussed separately in section F.1, infra
 
 
 [51]
 The jury was properly instructed on this form of "estoppel"; see the second part of the instruction quoted supra note 49
 
 
 [52]
 The court defined "duress" as follows:
 You are instructed that duress is a condition in which one is induced by wrongful act or threat of another to make, alter, or cancel a contract under circumstances which deprive him of the exercise of his free will. There can be no duress unless there is a threat to do some act which the party threatening had no legal right to do.
 * * *
 You are instructed that duress may be evidenced when a threatening party acts oppressively to further its own economic interest. It also may be evidenced by forcing a victim to choose between distasteful and costly situations, i.e., bow to duress or face bankruptcy, loss of credit rating, or loss of profits from a venture.
 We seriously doubt whether the last sentence of the quoted instruction is an accurate statement of the law, but even with that invitation and the question "Do you find that Panhandle Eastern Pipeline's (PEPL) conduct in question with the termination of the Hufo/True Gas Purchase Contract constituted duress as to True?," the jury answered "No."
 
 
 [53]
 As a matter of fact, the plaintiffs did sue for conversion of the gas purchased by PEPL!--but of course our present concern is only with that part of the judgment that cannot be sustained by the jury's finding of consent
 
 
 [54]
 Mitchell's liability is not distinct from its subsidiary LEC's liabililty; for simplicity we refer only to Mitchell throughout this section. Houston Natural Gas Corporation ("HNG") and its affiliates claimed at trial to have reasonably relied on PEPL's relationship to True to justify their subsequent purchases; they also submitted negligent misrepresentation issues to the jury. We will not treat their claims separately, as our analysis of Mitchell's claims disposes of any defenses raised by HNG
 
 
 [55]
 The instruction on negligent misrepresentation reads in part:
 In order to find that a negligent misrepresentation occurred Mitchell and HNG must prove each of the following elements:
 First, that PEPL, in the course of its business, supplied false or incorrect information to Mitchell and HNG for their guidance in the course of their business; and
 Second, that PEPL failed to exercise reasonable care or competence to communicate correct information to Mitchell and HNG; and
 Third, that Mitchell and HNG justifiably relied upon the information from PEPL and suffered a loss of money that was proximately caused by such reliance; and
 Fourth, that Panhandle [PEPL] manifested an intent to supply the information for the sort of use in which the loss to Mitchell and HNG occurred.
 
 
 [56]
 The jury instruction begins by stating: "Mitchell claims that Plaintiffs, through PEPL, released any cause of action Plaintiffs may have against Mitchell when PEPL released the gas it had been purchasing from True to Mitchell." The potential for confusion in this double use of "release" is evident
 
 
 [57]
 Some of the defendants argue that they did nothing past the time of the filing of the plaintiffs' lawsuits that would give rise to liability for conversion; that question of fact is for the district court on remand